UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CRAB HOUSE OF DOUGLASTON, INC. d/b/a
DOUGLASTON MANOR; COLLEGE POINT
RESTAURANT, CORP. d/b/a GALLAGHER'S
II; RON BON PUB, INC. d/b/a
GALLAGHER'S; ET WEEK PUBLICATION,
 INC.; GREENBERG & STEIN, LLP.; JOSEPH
MAURO; PARALLEL PRODUCTIONS, INC.;
PARK AVENUE  AESTHETIC SURGERY,
PC; SCOTT A. RUSSO; and TAC CATERING
INC., ON BEHALF OF THEMSELVES AND
ALL SIMILARLY-SITUATED PERSONS
AND ENTITIES

                          Plaintiffs,

                                                               **MEMORANDUM & ORDER**

        - against -                         04-CV–0558 (DRH) (WDW)

NEWSDAY, INC.; HOY, LLC; UNITED
MEDIA DISTRIBUTORS, LLC;
DISTRIBUTION SYSTEMS OF AMERICA,
INC.; HAROLD FOLEY; ROBERT GARCIA;
ROBERT HAUFMAN; FRED HERB;
ROBERT  BRENNAN; LOUIS S. SITO;
KEITH POTTHOFF; and "JOHN DOES" "1"
THROUGH, "25,"

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
**APPEARANCES :**

**GIAIMO & VREEBURG LLP**
Attorney for Plaintiffs
80-02 Kew Gardens Road
Kew Gardens, NY 11415
By: Joseph O. Giaimo, Esq.

**WECHSLER, HARWOOD, HALEBIEN & FEFFER LLP**
Attorneys for Plaintiffs
488 Madison Avenue, 7th Floor
New York, NY 10022
By: Samuel Kenneth Rosen, Esq., & Robert Ira Harwood, Esq.

**SIDLEY, AUSTIN, BROWN & WOOD**
Attorney for Defendants
787 Seventh Avenue
New York, NY 10019-6018
By: Robert Wolfgang Hirth, Esq.

**CLIFFORD CHANCE US LLP**
Attorneys for Defendant Halfmann
31 West 52nd Street
New York, NY 10019
By: David Meister, Esq., & Mark Adam Weissman, Esq.

**DECHERT LLP**
Attorney for Defendant Brennan
30 Rockefeller Plaza
New York, NY 10112
By: Matthew J. Lang, Esq., & Edward A. McDonald, Esq.

**JUDD BURSTEIN, P.C.**
Attorney for Defendant Sito
1790 Broadway
Suite 1501
New York, NY 10019
By: Judd Burstein, Esq.

**DEFEIS, O'CONNELL & ROSE, P.C.**
Attorney for Defendant Pothoff
500 Fifth Avenue, Suite 2630
New York, NY 10110
By: Gregory J. O'Connell, Esq.

**HURLEY, District Judge:**


*INTRODUCTION*

The present lawsuit involves circulation misstatements made by two Long Island newspapers,

Newsday and Hoy. In fact, Newsday reported the scheme in its own pages:

> Newsday announced yesterday that an internal audit discovered its circulation had
> been inflated and said it is cutting previously reported figures for a six-month period
> last year by about 40,000 daily and 60,000 Sunday. . . . In addition, the Spanish-

language newspaper Hoy, which Newsday launched and is now a subsidiary of Tribune, Newsday's parent organization, is cutting its figures for the September period by about 15,000 daily and 4,000 Sunday. . . . Newspaper circulation figures help determine rates that advertisers pay. Analysts expect Newsday and Hoy to give rebates or free space to some advertisers to compensate for the inflated figures.

(2d Am. Compl. ("SAC") ¶ 75 (quoting N.Y. Newsday, June 17, 2004, at 1.).)

On behalf of those who purchased advertising based upon the bloated circulation figures, Plaintiffs Crab House of Douglaston, Inc., doing business as ("d/b/a") Douglaston Manor; College Point Restaurant, Corp. d/b/a Gallagher's II; Ron Bon Pub, Inc. d/b/a Gallagher's; ET Week Publication, Inc.; Greenberg & Stein, LLP; Joseph Mauro; Parallel Productions, Inc.; Park Avenue Aesthetic Surgery, PC; Scott A. Russo; and TAG Catering (collectively, "Plaintiffs") bring this putative class-action lawsuit against Corporate Defendants Newsday, Inc. ("Newsday"); Hoy, LLC ("Hoy"); United Media Distributors, LLC ("United"); Distribution Systems of America, Inc. ("DSA"), and Individual Defendants Harold Foley ("Foley"); Robert Garcia ("Garcia"); Thomas Langer ("Langer"); Robert Halfmann[1] ("Halfmann"); Fred Herb ("Herb"); Robert Brennan ("Brennan"); Louis S. Sito ("Sito"); Keith Pothoff[2] ("Pothoff"); and "John Does" "1" through "25" for violations of the Racketeer Influences and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d); violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unjust enrichment; and common law fraud.

This Court's jurisdiction over the putative class-action is premised exclusively upon the federal claims, *i.e.* the RICO and Lanham Act claims. (*See* SAC ¶ 9(a) (citing to 28 U.S.C. § 1331).) Defendants acknowledge that the facts of this case smack of common law fraud, but insist that "[t]his

---

[1]Defendant Robert Halfmann's last name is misspelled "Haufman" in the SAC.

[2]Defendant Keith Pothoff's last name is misspelled "Potthoff" in the SAC.

is not a federal RICO or 'unfair competition' case." (*Id.*) As a result, the Corporate Defendants and Individual Defendants Foley, Langer, Halfmann, Brennan, Sito, and Pothoff moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the SAC for failure to state a claim as to each of the alleged federal causes of action and ask the Court to decline supplementary jurisdiction over the common law claims. For the reasons set forth herein, the Court GRANTS Defendants' motions, but also GRANTS Plaintiffs leave to submit a Third Amended Complaint.

*BACKGROUND*

The following summary of facts is drawn from the SAC. The Court, as it must for the purposes of the present motion, accepts all of Plaintiffs' allegations as true, including the employment histories of the Individual Defendants.

**I.    *The Parties***

Plaintiffs represent a putative class of corporations and individuals who purchased advertising with Newsday and Hoy from 1995 to the present (hereinafter, the "class period"). Though there are only ten named plaintiffs, Plaintiffs hypothesize that there are tens of thousands of class members.

Corporate Defendant Newsday is a corporation organized under the laws of the State of New York, a wholly-owned subsidiary of the Tribune company, and "a publisher and distributor or co-publisher and co-distributor of 'Newsday' and 'Hoy' newspapers." (SAC ¶ 65.) Corporate Defendant Hoy is a limited liability company organized under the laws of the State of New York, also a wholly-owned subsidiary of the Tribune Company, and "a publisher and or co-publisher and co-distributor of 'Hoy' newspaper." (SAC ¶ 66.)

Corporate Defendant DSA, a corporation organized under the laws of New York and a wholly-owned subsidiary of the Tribune Company, has been the sole distributor of Newsday and Hoy from April 2, 1999, and has been delivering flyers to enumerated households from September 1990 to the present.

Corporate Defendant United is a limited liability company organized under the laws of the State of New York, the sole independent distributor of Newsday throughout the Greater New York metropolitan area from March 5, 1998 to April 2, 1999 and simultaneously the sole independent distributor of Hoy in the distribution area from November 15, 1998 to April 2, 1999. Unlike the other Corporate Defendants, United is not alleged to be a wholly-owned subsidiary of the Tribune Company. Rather, 51 percent of United stock was owned by DSA, 47.04 percent by Anthony Orlacchio ("Orlacchio"), President, and Michael Pouchie ("Pouchie"), Executive Vice President, and 1.96 percent by Defendant Langer.

The above corporations and limited liability companies are referred to as the "Corporate Defendants" as context demands.

Non-parties Volmar Distributors, Inc. ("Volmar") and American Media Distributors, Inc. ("American") combined with United, and DSA as the distributors of Newsday and Hoy (hereinafter, Volmar, American, United and DSA will be referenced, collectively, as the "Distributor"). Volmar was the sole independent Newsday distributor of Newsday in the distribution area from September 1981 until January 1997. American, a limited liability company organized on or about December 17, 1996 under the laws of the State of New York, was Volmar's successor in interest until its assets were acquired by United on or about March 5, 1998. Pouchie and Orlacchio were the principal stockholders of American, which was the sole

-5-

independent distributor of Newsday in the distribution area from January 1997 to on or about March 5, 1998.

Individual Defendant Foley is a resident of Oneida County, New York, and is a computer programmer and an independent contractor for the Distributor. Foley allegedly created the computer programs that were used to conduct the distribution of Newsday and Hoy.

Defendant Garcia is a resident of Kings County, New York. During the class period, Garcia was an employee, agent, and sales manager for Newsday, overseeing the distribution of Newsday, and the circulation director for Hoy when it began publication in November 1998.

Defendant Langer is a resident of Westchester County, New York, and during the class period was an independent contractor, agent, and financial systems consultant for American; the chief financial officer of United; and an employee and agent of Newsday, Hoy, and DSA.

Defendant Halfmann is a resident of Suffolk County, New York, and during the class period was an employee, agent, and sales representative for Newsday, Hoy, and DSA.

Defendant Herb is a resident of Suffolk County, New York, and during the class period was an employee, agent, and sales representative for Newsday, Hoy, and DSA.

Defendant Brennan is a resident of Suffolk County, New York, and during the class period was an employee and agent for Newsday, Hoy, and DSA, and the Vice President of Circulation for Newsday. Brennan was either placed on administrative leave or terminated by Newsday on June 16, 2004, when the Tribune Company and Newsday publicly acknowledged that Newsday and Hoy had inflated their circulation volume. (*See* SAC ¶ 75 (excerpting the public release).)

Defendant Sito is a resident of Suffolk County, New York, and during the class period was an employee and agent of Newsday, Hoy, and DSA and is the president of Hoy, Executive Vice President of Newsday, and Vice President and National Director of Hispanic publications for the Tribune Company.

Defendant Pothoff is a resident of Suffolk County, New York, and during the class period was an employee of Newsday, Hoy, and DSA, and a former General Manager of United.

Defendants "John Does" "1" through "25" are officers, directors, employees, representatives, or agents of one or more of the Corporate Defendants who participated in the alleged enterprise and who, by reason of their positions, participated in, furthered, or exercised supervision and control over the alleged enterprise.

The above individuals are referred to as the "Individual Defendants" as context demands.

Finally, non-party Audit Bureau of Circulation ("ABC") is a not-for-profit corporation authorized to do business in New York. ABC, an "independent auditing company and self-regulatory auditing organization engaged and responsible to advertisers, advertising agencies and the media they employ" (*Id.* ¶ 95), was the auditor of Newsday's and Hoy's circulation volumes.

## II.     *The Alleged RICO Enterprises*

Plaintiffs allege that "each of the Defendants managed or operated and/or participated in the conduct of the affairs of three Enterprises to wit, the Circulation Enterprise and the Newsday and Hoy Enterprises through a pattern of racketeering activity consisting of mail fraud." (*Id.* ¶ 4; *see also id.* ¶ 181.)

### A.     *The Newsday Enterprise*

The SAC reads: "The first Enterprise, Company Defendant Newsday, corporation, is an Enterprise within 18 U.S.C. § 1961(4)."  (*Id.* ¶ 181(1).)

**B.**     ***The Hoy Enterprise***

The SAC further reads: "The second Enterprise, Company Defendant Hoy, a limited liability company, is an Enterprise within the meaning of 18 U.S.C. § 1961(4)."  (*Id.* ¶ 181(2).)

**C.**     ***The Circulation Enterprise***

The third and final alleged enterprise is the "Circulation Enterprise," an "association-in-fact" enterprise consisting of (1) Individual Defendants; (2) Defendants Newsday and Hoy; (3) the Distributor; and (4) ABC.  (*Id.* ¶¶ 6, 181(3).)

The alleged purposes of the Circulation Enterprise were "lawful and unlawful."  (*Id.* ¶ 182.)  The "lawful purposes" were "the legitimate business of planning, developing, marketing, selling, distributing, and managing the circulation of Newsday and Hoy and the delivery of flyers, . . . and other services related to the publication of a newspaper and direct delivery of advertising flyers to households."  (*Id.*)  The "unlawful purposes" were generating increased revenues and profits by falsely inflating circulation volumes; "defrauding, cheating, and stealing money" from Plaintiffs; and concealing the existence and operations of the Circulation Enterprise. (*Id.* ¶ 183.)

**III.**   ***The Alleged Scheme***

Plaintiffs contend that through a scheme devised and orchestrated by the Individual Defendants and Corporate Defendants Newsday and Hoy, Plaintiffs were duped into purchasing advertising at an inflated price that was based upon falsified circulation figures.  The system functioned in the following way.  The Distributor delivered Newsday to retailers through delivery drivers, "who delivered the newspapers to retail outlets, such as grocery stores, stationery stores,

supermarkets, chain stores and similar retail outlets." (SAC ¶ 101.) Unsold newspapers were picked up by the delivery drivers and then returned to the Distributor's distribution warehouse. The Distributor would bill the retail outlets at the end of each week for the previous week's purchases, less returns. The Distributor would then pay Newsday based upon the number of papers actually sold, and submit a weekly affidavit of sales and returns. These affidavits were submitted to the auditing company once every six months for certification of the circulation numbers. Defendants allegedly reported false circulation figures to ABC, ABC audited and certified those circulation figures without rigorously checking the numbers because of ABC's close relationship with various individuals at Newsday and Hoy, and then Plaintiffs purchased advertising based upon ABC's audits and certifications. All of the claims emanate from these elemental allegations.

From or about October 1995, Defendant Garcia, a Newsday employee, contacted Randy Green ("Green"), an employee of the Distributor, to determine whether the Distributor's computer could be altered to either increase Newsday sales or lower the returns. Green indicated that it was possible, and the scheme commenced. Green would deliver the Distributor's weekly affidavit to Garcia who would review the affidavit with his superior, Defendant Sito. Defendants Garcia and Sito would then change the numbers in the affidavit to increase the sales figures and reduce the number of returns.

According to the SAC, beginning in October 1995 through July 1999, when Green received the altered affidavit, he would input the contents into the Distributor's computer using a program labeled "Short," "originally designed by Defendant Foley, to make minor corrections to

the affidavits and various reports." (*See id.* ¶ 108.)  Just a few paragraphs later, however, the

SAC states:

> During the Class period and in or about late 1995 or early 1996 Defendant Foley and Green created a computer program labeled "Fudge ABC" which was used by the Distributor and Defendants to alter the Distributor's reports and weekly affidavits and which was used by Defendant Garcia on an average of every six weeks during the Class period to fraudulently inflate Newsday's circulation volume and conceal from ABC the discrepancy between the Distributor's report and affidavit.

(*Id.* ¶ 117.)  It appears that the "Short" program and the "Fudge ABC" program performed

essentially the same function, and Plaintiffs make no attempt to resolve this ambiguity.

Plaintiffs also allege that during the Class period, Newsday would "force-feed" the

Distributor every few weeks by placing unordered loads of Newsday on the Distributor's loading

dock.  "At the direction of Defendant Garcia and other management personnel, the Distributor

would dump the unsold Newsdays and not report the returns in its weekly affidavit and the

Distributor was not charged for the unordered Newsdays delivered to the Distributor." (*Id.* ¶

120.)  Plaintiffs further allege other methods and opportunities that Newsday took to inflate its

figures.

Every six months, the altered affidavits were reported to ABC for auditing and

certification of Newsday's circulation numbers.  Ed Smith ("Smith"), the Circulation

Administration Manager of Newsday, maintained a close relationship with ABC's auditors.

Smith would "entertain" ABC auditors, thereby "compromis[ing] the thoroughness of ABC's

auditing activities." (*Id.* ¶ 112.)  The specifics of how Smith managed to compromise ABC's

performance remain unarticulated.

On November 11, 1998, the Corporate Defendants began circulation of Hoy, a Spanish-language newspaper. Defendant Garcia also worked as the Circulation Director of Hoy, and implemented an identical scheme. This time, Garcia involved Pouchie. Garcia, as he did with Green, directed Pouchie to inflate the reported sales.

Plaintiffs' original Complaint, filed on February 10, 2004, went before the Honorable Leonard D. Wexler. An Amended Complaint was filed on July 14, 2004. For reasons not relevant to the present discussion, the case was reassigned to this Court on August 24, 2004. Thereafter, on December 14, 2004, Plaintiffs filed a Second Amended Complaint. Six months later, on June 22, 2005, Defendants filed the present motions to dismiss.

*STANDARD*

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999). The court must accept the factual allegations contained in the complaint as true, and view the pleadings in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

Dismissal under Rule 12(b)(6) is appropriate only if it appears beyond doubt that a plaintiff can prove no set of facts entitling it to relief in support of its claim. *Zerilli-Edelglass v. N. Y. City Transit Auth.*, 333 F.3d 74, 79 (2d Cir. 2003). The issue is not how likely a plaintiff is to ultimately prevail, but whether it is entitled to even offer evidence to support its claims. "Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but

that is not the test." *Weisman v. LeLandais*, 532 F.2d 308, 311 (2d Cir. 1976); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Nevertheless, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (internal quotation omitted).

## DISCUSSION

Defendants contend that Plaintiffs have failed to state claims pursuant to § 1962(c), § 1962(d), and the Lanham Act. Defendants then argue that the court should not exercise supplemental jurisdiction over the ancillary state claims. Alternatively, Defendants argue that Plaintiffs have also failed to state claims of unjust enrichment and fraud. Plaintiffs contest each point. The Court considers each of these arguments separately.

## I.    *RICO*

RICO is a broadly worded statute that "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617, at 76 (1969); *see* Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. 91-452, 84 Stat. 922, 922-23 (1970); *see also Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001). "RICO provides that '[a]ny person injured in his business or property by reason of' a RICO violation may bring a civil action to recover treble damages." *Canada*, 268 F.3d at 107 (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) (quoting 18 U.S.C. § 1964(c))).

To establish a violation of § 1962(c), Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473

U.S. 479, 496 (1985); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001); *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994).

## II.    *Failure to State a § 1962 (c) RICO Claim*

Both Counts I and III allege violations of § 1962(c).  (*See* SAC ¶¶ 220-27, 232-38.) Defendants move to dismiss Count III on the grounds that the alleged "Circulation Enterprise" is not a cognizable RICO enterprise.  (*See* Defs.' Mem. at 6.)  Defendants move to dismiss Count I on the grounds that the SAC fails to allege that Individual Defendants "conducted" a RICO enterprise and that the SAC fails to allege that Individual Defendants committed at least two predicate acts of racketeering activity.  (*See id.* at 11.)

### A.    *Failure to Plead a RICO Enterprise as to Count III*

Count III is directed toward each of the Defendants, including the Corporate Defendants, as having conducted the Circulation Enterprise.  Defendants contend that Plaintiffs have failed to adequately plead that the alleged, association-in-fact "Circulation Enterprise" constitutes a RICO enterprise because Plaintiffs have not pleaded that the individuals that constitute the enterprise shared a common purpose.  (*See id.* at 8.)  Plaintiffs counter that the articulation of the Circulation Enterprise is adequate because the individuals shared a common, legal purpose, even though they did not share a common, illegal purpose.  (*See* Pls.' Opp'n Mem. at 19.)

A RICO "enterprise" is statutorily defined to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  This definition has been expounded by case law, as requiring "a group of persons associated together for a common purpose of engaging

-13-

in a course of conduct, the existence of which is proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981) (internal quotations omitted)). Such an association of "individuals" may include corporations. *See United States v. Huber*, 603 F.2d 387 (2d Cir. 1979) (stating that a group of corporations may comprise an association-in-fact enterprise). An enterprise must share a common purpose among its members. *See First Capital*, 385 F.3d at 173.

Plaintiffs allege that the Circulation Enterprise is an association-in-fact enterprise "composed of the Individual Defendants . . . the Company Defendants Newsday and Hoy, *and ABC* . . . ." (SAC ¶ 181(3) (emphasis added).) The SAC alleges that the Circulation Enterprise had both lawful and unlawful purposes, *i.e.* the lawful purpose of distributing the newspapers and the delivery of flyers and the unlawful purpose of artificially inflating the circulation volumes. (*See id.* ¶¶ 182-83.)

The Court first considers unlawful purpose. The SAC claims that the "targeted victims" of the unlawful purpose "were, and continue to be, ABC as well as the Representative Plaintiffs and Class members." (*See id.* ¶ 184.) As a matter of law, ABC could not have shared the unlawful purpose of the Circulation Enterprise because, as the SAC articulates, ABC was a victim of the unlawful purpose. (*See id.* ¶ 181(3) ("The Company Defendants Newsday, Hoy and DSA and the Distributor, in fact, unlawfully victimized ABC and used ABC as an innocent instrument of the Circulation Enterprise to victimize the Representative Plaintiffs.").) Since

ABC did not share the unlawful purpose, the question narrows to whether ABC shared in the Circulation Enterprise's lawful purpose.

Defendants criticize Plaintiffs' articulation of the lawful purpose because it does not involve ABC at all. The SAC describes ABC as "an independent auditing company and self-regulatory auditing organization engaged by and responsible to advertisers, advertising agencies and the media they employ, and various newspapers and magazine publishers throughout the United States, for the independent verification and dissemination of its members' circulation." (*Id.* ¶ 95.) In contrast, the alleged lawful purpose of the Circulation Enterprise is:

> the legitimate business of planning, developing, marketing, selling, distributing and managing the circulation of Newsday and Hoy and the delivery of flyers including, without limitation, news reports, editing, designing, printing, creating advertisements, distributing, creating computer services and other services related to the publication of a newspaper and direct delivery of advertising flyers to households.

(SAC ¶ 182.) Based upon these pleadings, there is no way to reasonably infer that ABC played a role in the lawful purpose of the Circulation Enterprise. The lawful purpose of the Circulation Enterprise was the "planning, developing, marketing, selling, distributing and managing the circulation of Newsday and Hoy", while ABC was representing "the industry standard for integrity, objectivity and accuracy." (SAC ¶ 97.) That is to say, the SAC's recognition of ABC's "objectivity" is incommensurate with the suggestion that ABC was in any way involved with the management of one of the media outlets that it was supposed to oversee.

In fact, ABC is depicted in the SAC as a wholly independent organization with a single goal: the dissemination of ABC-audited information that enables its "tripartite membership" to "plan, purchase and sell media advertising with confidence." (SAC ¶ 97.) The tripartite

membership includes numerous advertising purchasers as well as advertising vendors. As a result, the SAC's portrayal of ABC manifests no commitment to the of "planning, developing, marketing, selling, distributing and managing the circulation" of *any* specific advertising purchaser or advertising vendor, let alone Newsday and Hoy.

Plaintiffs try to resuscitate their claim by arguing that "[t]he members of the industry and their audit bureau were (and are) in a symbiotic relationship of mutual interdependence." (Opp'n Mem. at 20.) The asseveration of "mutual interdependence" in the Opposition Memorandum directly contradict the SAC's description of ABC as "independent" and "self-regulatory." Indeed, the SAC's description of ABC as "independent" and "self-regulatory," belies any suggestion that ABC was part of an enterprise that involved either Newsday or Hoy in particular.

Thus, the articulated purpose of the Circulation Enterprise directly involved the internal affairs of both Newsday and Hoy, but it is clear from the SAC that ABC was never involved with the operation, management, or internal affairs of either one of those media outlets. Accordingly, the connection between ABC on the one hand and Newsday and Hoy in no way merits the inference that they were members of the same RICO enterprise.

Though Plaintiffs do not argue an alternative conception of the Circulation Enterprise, the Court thinks that the above discussion begs for a brief consideration of the Circulation Enterprise absent ABC. On that point, it is unclear whether the remaining associated entities would constitute a RICO enterprise. Defendants briefly mention the difficulty of pleading a RICO enterprise that "consists of the affiliated corporate defendants and their employees and agents" (*See* Defs.' Mem. at 8), but provide no further analysis.

According to Second Circuit case law, the "person" who engages in the pattern of racketeering activity must be an entity distinct from the enterprise, at least where the entity is a corporation. *See Bennett v. United States Trust Co. of N.Y.*, 770 F.2d 308, 315 (2d Cir. 1985). In other words, an enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. On this point, the *Discon* opinion is instructive. In *Discon*, the Second Circuit noted that a wholly-owned subsidiary is not distinct from its parent corporation. *See id.* at 1064. Accordingly, the court dismissed the complaint for failing to satisfy the "distinctiveness" requirement, explaining:

> NYNEX, MECo and NYTel operate within a unified corporate structure. At the same time, however, they are also legally separate entities from each other and from the [enterprise]. . . [T]he individual defendants were acting within the scope of a single corporate structure, guided by a single corporate consciousness. It would be inconsistent for a RICO person, acting within the scope of its authority, to be subject to liability simply because it is separately incorporated . . . .

*Discon*, 93 F.3d at 1064 (2d Cir. 1996); *cf. Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 366 (E.D.N.Y. 2000) ("Subsidiaries and other affiliates of a parent corporation–alone or together with the parent corporation–do not constitute a RICO enterprise distinct from the parent corporation."). Based upon *Discon*, if the Corporate Defendants were part of a uniform corporate structure, then they would fail the "distinctiveness" requirement of *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, and its progeny. *See* 30 F.3d 339, 343-44 (2d Cir. 1994) (holding that "the [RICO] person and the enterprise referred to must be distinct").

Whether the Corporate Defendants were part of a uniform corporate structure is not settled by the pleadings. The SAC suggests that they were not guided by a single corporate

consciousness, but does so in an off-handed, impermissibly conclusory fashion. (*See* SAC ¶ 69 ("[P]ersonnel from the Tribune Company were present and DSA was in fear of what the carriers might say to the Tribune Company about dumping.").) The Court anticipates that this likely presents a question of fact. Nevertheless, Plaintiffs did not offer this or any other alternative conception of the Circulation Enterprise in the SAC. Consequently, the Court cannot fully assess the merits of an alternative conception of the Circulation Enterprise in this opinion.

Thus, the Court has found that the Circulation Enterprise, as pleaded, fails as a RICO enterprise because the neither the alleged lawful or unlawful purpose of the Circulation Enterprise involved ABC. Because Plaintiffs have failed to plead an enterprise with regard to Count III, the Court grants Defendants' motion to dismiss.

**B.      *Failure to Allege a § 1962 (c) Violation as to Count I***

Count I alleges that the Individual Defendants conducted the affairs of each of the three alleged enterprises, Newsday, Hoy, and the Circulation Enterprise in violation of § 1962(c). (*See id.* ¶ 223.) Under § 1962(c), it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Individual Defendants Foley, Langer, Halfmann, Pothoff, Brennan, and Sito ("Moving Individual Defendants") move to dismiss Count I because: (1) the SAC fails to allege that the Individual Defendants "conducted" the affairs of the purported enterprises; and (2) the SAC fails to alleged that the Individual Defendants committed predicate acts of "racketeering activity" (*See* Defs.' Mem. at 11, 13; *see also* Def. Halfmann's Mem. at 1; Def. Brennan's Mem. at 1; Def.

Sito's Mem. at 2; Def. Pothoff's Mem. at 1). Plaintiffs oppose the motion, arguing that the SAC

"identifies in ample detail each Individual Defendant's role in the Circulation Enterprise." (*See*

Pls.' Opp'n Mem. at 23.)

1. *"Conduct"*

The Moving Individual Defendants argue that there are no allegations that they

"conducted" the enterprise: at best, they argue, the factual allegations plead the "'[p]erformance

of tasks that are "necessary or helpful" to the enterprise.'" (Defs.' Mem. at 13 (quoting *LeSavoy*

*v. Lane*, 304 F. Supp. 2d 520, 534 (S.D.N.Y. 2004) (quoting *United States v. Viola*, 35 F.3d 37,

40-41 (2d Cir. 1994))).) Plaintiffs simply counter that "[t]he SAC identifies in ample detail each

Individual Defendant's role in the Circulation Enterprise."[3]

In order to satisfy the "conduct" element, a "plaintiff must plead each Defendant's

participation in the 'operation or management' of an enterprise." *LeSavoy*, 304 F. Supp. 2d at

534. In *Reves,* the Supreme Court held that " 'to conduct or participate, directly or indirectly, in

the conduct of [an] enterprise's affairs,' [as required by] § 1962(c), one must participate in the

operation or management of the enterprise itself," 507 U.S. 170, 185 (1995), and at a minimum

must play "some part in directing the enterprise's affairs," *id.* at 179. The Court recognized that

---

[3]Plaintiffs then cite to paragraphs "70-75, 77, 78, 106-108, 110, 111, 117-123, 127, 133-137, (2d) 138-141, 144, 145, 153, 157, 181, 188, 190, and 215." The Court notes that while one might expect thirty-eight paragraphs to provide "ample detail," it is clear from the number of the cited paragraphs and the SAC's haphazard organization that it would be difficult for any Defendant to locate the precise details that related to himself. The allegations against the Individual Defendants are scattered and difficult to connect, and even the paragraphs above-cited by Plaintiffs do not always contain allegations directed at the Individual Defendants. (*See, e.g.,* SAC ¶ 157.) Furthermore, though the SAC contains 279 paragraphs, many of those paragraphs are repetitive, resistant to chronology, and underwhelming in their specificity as to any individual.

those who operate or direct a RICO enterprise sufficient to conduct its affairs are not limited to "upper management," but might also be "lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184.

Under the *Reves* operation-management test, even if a defendant is not acting in a managerial role, he can still be liable for directing the enterprise's affairs if he "exercised broad discretion" in carrying out the instructions of his principal. *Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995). At the end of the day, however, "the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 2000) (citing to *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994); *see also First Capital*, 385 F.3d at 175-76.

The allegations regarding Defendant Foley are distinct and relatively easy to assess. The allegations regarding Individual Defendants Langer, Halfmann, Brennan, and Pothoff, however, are more difficult because those Individual Defendants are typically lumped together in disjunctive allegations. For example, the SAC states that "Defendant Garcia or Defendants Langer, [Halfmann], Herb, and Brennan" "systematically directed" the false inflation of Newsday's sales figures. (SAC ¶ 119.) The allegation clearly hopes to satisfy the requirement that each of the named Individual Defendants "directed" the enterprise, but the use of "or" runs counter to that purpose. Aside from that problem, the allegation, standing alone, is purely conclusory. The Court analyzes the general assertions together with any specific allegations regarding an Individual Defendant to determine whether the SAC adequately asserts that he individually conducted the affairs of the enterprises.

### a. *Defendant Foley*

According to the SAC, Defendant Foley "was and is a computer programmer" who "created the Distributor's computer programs which were used for and during the distribution of Newsday and Hoy." (*See* SAC ¶ 70.)  The allegations do not explicitly state that Defendant Foley did anything more than create a program.  Therefore, his actions, as alleged with regard to the enterprises, were passive rather than active.

Though the test is whether a plaintiff might succeed under any showing consistent with the allegations, *see H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 249 (1989), Plaintiffs' pleadings with regard to Defendant Foley are obviously those of an individual who had no part in "directing" the affairs of the enterprise.  *See Diaz*, 175 F.3d at 92 (holding that the mere "taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise" is insufficient); *see also Redtail Leasing, Inc. v. Bellezza*, 1997 WL 603496, *5 (S.D.N.Y. Sept. 30, 1997) ("A defendant does not 'direct' an enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise.").  Accordingly, the Court finds that the pleadings with regard to Defendant Foley inadequately plead "conduct."

### b. *Defendant Langer*

Defendant Langer is referenced in paragraphs 72, 119, 125, 133, 134, 139, 181, 188, and 215.  Paragraphs 119, 125, 134, 181, 188, and 215 contain general assertions about Defendant Langer, but nothing regarding his activities within the alleged RICO enterprises.  Substantive allegations occur only in paragraphs 72, 133, and 139.  Paragraph 72 asserts that "Green was systematically directed every few weeks by Defendant Garcia, or Defendants Langer, [Halfmann], Herb, and Brennan to falsely inflate Newsday sales figures."  The allegations in this

paragraphs are "specific" in that they make specific factual assertions. They are inadequate, however, because they are stated in the disjunctive, and fail to attach any specific factual allegations to Defendant Langer.

The allegations in paragraph 133, meanwhile, are difficult to parse, but do appear to provide some support for the assertion that Langer "conducted" the affairs of the enterprises. (*See* SAC ¶ 133 ("Defendant's [*sic*] Langer, Garcia, Herb and Pothoff would individually and/or with one or more of them, meet on a regular bi-monthly basis with Green and/or Pouchie to discuss the best method of fraudulently adjusting the Distributor's Newsday sales affidavits . . . .").) Paragraph 139 attributes a specific speech act to Defendant Langer. Therein, Plaintiffs allege that Defendant Sito told Pouchie to make changes to Hoy's circulation volume and that "Defendant Langer later told Pouchie that it was, 'Better for [Pouchie] to cooperate' with Defendants Newsday and Hoy by continuing to inflate the circulation volume . . . ." (*Id.* ¶ 139.) Though the allegations in paragraphs 133 and 139 are hardly concrete, they are sufficient at the pleading stage because they merit a reasonable inference that Langer exercised some control over the management of the enterprises' affairs. Therefore, Defendant Langer's motion to dismiss Count I for failure to adequately plead "conduct" of the enterprises is denied.

### c. *Defendant Brennan*

According to Defendant Brennan, he only appears in three substantive allegations, and those allegations "clump Brennan together with the other defendants in vague and hearsay-based assertions." (Def. Brennan's Mem. at 3 (quoting SAC ¶¶ 119, 133, 145).) Indeed, in those paragraphs Plaintiffs attribute no conduct directly to Defendant Brennan, but rather attribute vague acts of "systematic direction" to a list of individuals. (*See, e.g.,* SAC ¶ 119 ("Green was

systematically directed every few weeks by Defendant Garcia or Defendants Langer, [Halfmann],

Herb and Brennan . . . .").)  As previously stated, these disjunctive allegations are inadequate.

Other references to Defendant Brennan, not addressed in his memorandum, are similarly

vague and fail to allege "conduct."  For example, the SAC alleges that weekly reports were e-

mailed to Defendant Brennan regarding changes in the circulation numbers (*see id.* ¶ 154), and

that "Neshat [a systems analyst who created an internal computer program for use in identifying

the circulation volume of Newsday, Hoy, and DSA] worked under the direct supervision of

Defendant Brennan." (*Id.* ¶ 155).  Brennan was allegedly aware of the changes to the circulation

volume and he was allegedly directly supervising someone who was making changes.  These

assertions do not allege RICO conduct, however, because there is no attempt to distinguish

Brennan in his legitimate capacity as a supervisor within Newsday, and Brennan in his

illegitimate capacity as a director or manager of the enterprise.  In other words, Brennan's alleged

official position at Newsday was that of supervisor, so the fact that he directly supervised Neshat

is true as a matter of rote, and hardly conjures the specter of enterprise-conductor.  As a result,

the SAC fails to allege that Brennan "conducted" an enterprise.

### d.    *Defendant Halfmann*

Defendant Halfmann contends that the allegations against him in the SAC are merely

conclusory.  (*See* Def. Halfmann's Mem. at 2.)  According to the SAC, "Green was

systematically directed every few weeks by Defendant Garcia, or Defendants Langer,

[Halfmann], Herb, and Brennan, to falsely inflate Newsday sales figures . . . ." (SAC ¶ 119.)

This statement is inconsistent, however, with a later assertion that "Green began training his

replacements, Defendants [Halfmann] and Herb, to manipulate DSA's computers so as to

constantly and fraudulently inflate Company Defendant Newsday's and Hoy [*sic*] circulation volume." (*Id.* ¶ 144; *see also id.* ¶ 107 ("Green changed the affidavit with his trainees, Defendants Herb and [Halfmann].").) This training apparently took place in May, June, and July 1999, the last three months of the class period. (*See id.* ¶ 107.) Thus, the general allegation of supervision is directly undercut by the more specific assertion that Halfmann was a trainee, crippling Plaintiffs' claims against Halfmann. *See Jones v. Nat'l Comm. & Surveillance Networks*, No. 05 Civ. 3461 (AKH), 2006 WL 73623, *9 (S.D.N.Y. Jan. 12, 2006) ("[T]he complaint is not saved by conclusory allegations that are inconsistent with the facts pled, or a common sense understanding of those facts.").

The SAC also refers to Halfmann in general terms. (*See* SAC ¶ 189 ("[Brennan], Garcia, Langer, [Halfmann], and Pothoff . . . function in the Circulation Enterprise by providing overall leadership, management, and supervision . . . ."); *see also id.* ¶ 224 ("Each of the Individual Defendants was, and continues to be, associated with the Circulation Enterprise and the Company Defendants Newsday and Hoy, and managed, operated, and/or participated directly or indirectly, in the affairs of these Enterprises . . . ."); *id.* ¶ 215.) "'[S]weeping legal conclusions cast in the form of factual allegations' do not suffice to state a claim even at the Rule 12(b)(6) stage." *Law Offices of Curtis V. Trinko v. Bell Atlantic Corp.*, 294 F.3d 307, 333 (2d Cir. 2002) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)). "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). Plaintiffs' allegations regarding Defendant Halfmann are just that: sweeping. They make no attempt to distinguish Halfmann

from the other Individual Defendants, and attribute no specific conduct to him.  As a result,

Defendant Halfmann's motion to dismiss as to Count I is granted.

### e. *Defendant Pothoff*

Finally, Defendant Pothoff argues that the SAC "does not allege that Mr. Pothoff in any

way actually altered documents to inflate circulation figures, nor does it allege that Mr. Pothoff

did anything more than engage in discussions."  (Def. Pothoff's Mem. at 3.)  Besides the

sweeping allegations discussed and found inadequate, *supra*, the SAC makes two other factual

allegations regarding Defendant Pothoff.  First, the SAC states that "Defendants Garcia, Herb

and Pothoff would say to Green and Pouchie that Defendant Brennan and Sito had directed them

to instruct Pouchie and Green to falsify the Newsday sales reports . . . ." (SAC ¶ 133.)  This

allegation is clearly inadequate to create even the possibility that Pothoff "conducted" the

enterprise, as the allegation is simply that Defendant Pothoff was a go-between, a taker of

directions and performer of tasks, but nothing more. *See Diaz*, 175 F.3d at 92 (holding that the

mere "taking of directions and performance of tasks that are 'necessary or helpful' to the

enterprise" is insufficient).  Defendant Pothoff thus correctly asserts that this allegation is

inadequate to satisfy the "conduct element."

Nevertheless, there is one allegation, conspicuously unacknowledged by Defendant

Pothoff, that satisfies the pleading requirements.  Plaintiffs allege that "when Green complained

to Company Defendant Newsday in or about June 1996 through July 1999 Defendant Pothoff

told Green to 'dump' the papers and that Company Defendant Newsday would adjust the bill so

that the Distributor would not have to pay for the papers that were dumped." (SAC ¶ 121.)  There

is no indication that Pothoff's instructions came from a higher-up.  Rather, the allegation is that

Pothoff gave directions to Green that were in furtherance of the alleged scheme. As a result, the SAC does allege that Defendant Pothoff "conducted" some aspect of the enterprises.

### 2. *"Racketeering Activity"*

Because the SAC failed to properly allege that Individual Defendants Foley, Brennan, and Halfmann "conducted" the affairs of an enterprise, the Court does not assess their arguments regarding the "racketeering activity" element. Thus, the Court now considers Individual Defendants Langer, Pothoff and Sito's motions to dismiss Count I because of Plaintiffs' failure to adequately plead that they committed acts of mail fraud in violation of 18 U.S.C. § 1341.

Defendants Langer, Pothoff and Sito argue that the SAC fails to identify the fraudulent statements or circumstances with particularity as required by Fed. R .Civ. P 9(b). Plaintiffs counter that the "Individual Defendants mistakenly assume in their arguments that they are responsible only for their own conduct, if any, that immediately injures plaintiffs. This is legally mistaken." (*See* Pls.' Opp'n Mem. at 27.) Ultimately, both parties argue at a skew to the more basic issue, which is the SAC's failure to adequately articulate the specific facts relating to the fraudulent mailings. *See G-I Holdings*, 179 F. Supp. 2d at 260 ("The requirements of Rule 9(b) of the Federal Rules of Civil Procedure must be complied with when mail and wire fraud are invoked as predicate acts in a civil RICO action.").

Section 1961(1) defines "racketeering activity" as certain criminal acts under state and federal law including mail fraud, 18 U .S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1)(B). The statute requires a plaintiff to plead at least two predicate acts of racketeering activity. *Id.* § 1961(5) "A complaint alleging mail and wire fraud must show

(1) the existence of a scheme to defraud, (2) defendant's knowing and intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir. 1996) (citation omitted); *see also U.S. v. Zichettello*, 208 F.3d 72, 105 (2d Cir. 2000) (wire fraud); *McLaughlin v. Anderson*, 962 F.2d 187, 190-91 (2d Cir. 1992) (mail fraud). The offense is complete upon the mailing or wire transmission, and each such mailing or transmission is a separate offense. *United States v. Eskow*, 422 F.2d 1060, 1064 (2d Cir. 1970).

In *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993), the Second Circuit stated that "allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Id.* at 1176. These requirements are consistent with Fed. R. Civ. P. 9(b), which dictates that in all averments of fraud, "the circumstances constituting fraud . . . shall be stated with particularity." This heightened pleading requirement is designed to provide Defendants with notice to enable preparation of their defense and protect Defendants against harm to their reputation or goodwill. *See DiVittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

There is little question that Plaintiffs have pled a general scheme to defraud. The SAC also adequately pled that Defendants Langer, Pothoff, and Sito participated in the scheme. The question, then, is whether the SAC adequately details the mail fraud itself.

The Court first notes that Plaintiffs fail to provide any specifics in the Counts. (SAC ¶ 226, 237 (alleging that Defendants committed "multiple, repeated and continuous instances of mail fraud . . . (as set forth above) . . . .").) Such failure, alone, can warrant dismissal of a RICO

claim.  This is because "RICO is a specialized statute requiring a particular configuration of elements. These elements cannot be incorporated loosely from a previous narration, but must be tightly particularized and connected in a complaint.  Parroting statutory language while generally referring the reader back to the previous one-hundred paragraphs in a complaint is inadequate." *Lesavoy*, 304 F. Supp. 2d at 532 (citations and quotation marks omitted).  The present SAC, at over 278 paragraphs, with facile incantations of more than two hundred prior paragraphs, woefully fails to provide specifics with regard to the mail fraud allegations.

Turning to the entire SAC, Plaintiffs fail to articulate the contents of the letters, where they were mailed, and to whom they were mailed.   As Defendant Sito argues, the allegations of mail fraud "rely[] instead upon allegations that unidentified 'agents or sales representatives' of Newsday, Hoy or DSA made false statements in miscellaneous 'promotional materials' delivered to various plaintiffs in person or by mail." (*See* Def. Sito's Mem. at 4-5.)  The SAC provides no delineation of how the scheme involved the mails.  In fact, in the section entitled, "Mail Fraud," the words "mail fraud" are used, but the substance of the paragraph makes no reference to any mailings. (*See* SAC ¶ 3.)

 Instead, the fraudulent mailings are only mentioned with regard to each Individual Plaintiff.  (*See id.* ¶¶ 15-34.)  Those paragraphs fail to state the content of those mailings, how they were fraudulent, or when they were received.  For example, the SAC states:

> Representative Plaintiff Crab House advertised in Newsday and Hoy because of the initial and continuing representations made by Defendants that Newsday's circulation was far greater in volume than any other daily or Sunday newspaper throughout the distribution area and that its circulation was honestly certified to the ABC and confirmed by the ABC; and the initial and continuing representations that Hoy had the highest circulation of any Hispanic newspaper in the distribution area, far exceeding other Hispanic newspapers and that its

circulation was honestly certified to the ABC and confirmed by the ABC. In addition to direct placement of advertising, during the Class period and from time to time Crab House employed an advertising agency to place its advertisements in Newsday and Hoy, as an agent in fact authorized by Crab House to rely upon the representations made by Defendants before placing advertisements in Newsday and/or Hoy.

(*Id.* ¶ 17.) Though this allegation provides specifics, it fails to allege which of the representations were fraudulent. Instead, it relies upon unreasonable inferences. For example, the SAC alleges that Hoy inflated its circulation numbers, but that does not lead to the conclusion that Hoy's representation that it had the highest circulation of any Hispanic newspaper in the distribution area was also false. Thus, from the SAC, it is not clear what misrepresentations in the mailings were fraudulent or precisely why they are fraudulent. Furthermore, the SAC fails to state when the mailings were made and to whom they were made. These shortcoming infect all of Plaintiff's allegations of mail fraud. (*See id.* ¶¶ 15-34.)

By comparison, in *Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999), the complaint "contain[ed] a chart listing twelve different mailings said to contain fraudulent representations, along with the dates of these mailings and cross-references to the paragraphs of the complaint in which the mailings are further discussed," and "the persons responsible for the allegedly fraudulent statements [we]re identified, and the chart lists dates and specific documents." 189 F.3d at 173. The SAC falls woefully short of this standard, and any further pleadings must provide the level of detail and organization illustrated in *Moore*.

In sum, the SAC fails to plead that Individual Defendants Foley, Brennan, and Halfmann "conducted" the affairs of a RICO enterprise. The SAC further fails to plead mail fraud, wherein one could infer that Individual Defendants Langer, Pothoff, and Sito engaged in at least two

predicate acts of mail fraud.   Accordingly, Count I, as it pertains to Individual Defendants Foley, Langer, Brennan, Halfmann, Pothoff, and Sito is dismissed.  Count I now pertains only to Individual Defendants Garcia and Herb, who did not move to dismiss.

### III.    *Failure to State a § 1962(d) RICO Claim*

Counts II, IV, and V assert claims under § 1962(d), which prohibits any person from conspiring to violate any of the substantive provisions of § 1962(a)-(c).  Under the law of this circuit, a claim under section 1962(d) alleging a conspiracy to violate the other subsections fails as a matter of law if the substantive claims based on the other subsections are defective.  *See Discon*, 93 F.3d at 1064 (citing and quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("'Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.'")); *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 300 (S.D.N.Y. 2004) ("'[I]n order to establish a violation of § 1962(d), the Supreme Court has held that a conspirator must intend to further an endeavor which, if completed, would satisfy all the elements of a substantive criminal offense . . . . In other words, a RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met.'") (quoting *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 156 (S.D.N.Y. 2000)).  Because Plaintiffs have failed to adequately plead substantive RICO violations pursuant to § 1962(c), Counts II, IV, and V are dismissed with regard to the Corporate Defendants, and Individual Defendants Foley, Langer, Brennan, Halfmann, Pothoff, and Sito.  Again, Individual Defendants Garcia and Herb did not move to dismiss.

### IV.    *Failure to State a Lanham Act Claim*

Count VII asserts a claim against Defendants Newsday and Hoy for "unfair competition" in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (*See* SAC ¶¶ 255-259.) Defendants move to dismiss the claim on two grounds: (1) there is no allegation that the questioned advertising was disseminated in interstate commerce; and (2) Plaintiffs lack standing under § 43(a) because they were not in competition with Defendants. (*See* Defs.' Mem. at 20-24.) Plaintiffs oppose the motion because: (1) according to Plaintiffs, the advertising *was* disseminated in interstate commerce; and (2) it is not necessary that a plaintiff be in competition, even indirect, with a defendant to have standing under the Lanham Act. (*See* Opp'n Mem. at 37, 39.) Because Plaintiffs lack standing to sue under the Lanham Act, the Court does not address the interstate commerce arguments.

"Section 43(a) of the Lanham Act provides two bases for liability: (I) false representations concerning the origin, association, or endorsement of goods or services through wrongful use of another's distinctive mark or other device ('false association'), and (ii) false representations in advertising concerning the qualities of goods and services ('false advertising')." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196-97 (2d Cir. 2001) (citing 15 U.S.C. § 1125(a)). Plaintiffs' Count VII applies the second basis for liability, *i.e.* false advertising, stating that "Defendants Newsday's and Hoy's false and misleading inflated descriptions or representations of fact concerning the circulation figures are material, literally false, and in violation of Section 43(a) of the Lanham Act." (SAC ¶ 256.)

"[T]o have standing for a [Lanham Act] false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury." *Telecom Int'l*, 280 F.3d at 197 (citations omitted); *cf. Gotlin v. Lederman*, 367 F. Supp. 2d 349, 355 (E.D.N.Y. 2005). Plaintiffs

assert, "It is not necessary that a plaintiff be in competition, even indirect, with a defendant to have standing under the Lanham Act." (Pls.' Opp'n Mem. at 39.)  Plaintiffs' characterization of the Second Circuit's position is gravely misleading.  Plaintiffs' reliance upon *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126 (2d Cir. 2004) is misplaced because the court in that case explicitly found that the parties were "direct competitors." *Id.* at 130.  Furthermore, Plaintiffs mischaracterize *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, when they suggest that *Ortho*'s interpretation of the Lanham Act would support standing where the parties are not in competition with another.  In fact, *Ortho* explicitly states, "[O]ur circuit has expressly disfavored presumptions of harm in cases where the products are not obviously in competition or where the defendant's advertisements make no direct reference to any competitor's products." *Id.* at 696 (citing *McNeilab, Inc. v. Am. Home Prods., Corp*, 848 F.2d 34, 38 (2d Cir. 1988); *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 316 (2d Cir. 1982); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980)).

Although the plaintiff does not have to be a "direct competitor" of the defendant to have standing, it is apparent that, at a minimum, standing to bring a section 43 claim requires the potential for a commercial, *i.e.* "competitive," injury. *Berni v. Int'l Gourmet Rest. of Am., Inc.*, 838 F.2d 642, 648 (2d Cir. 1988).  That is to say, the injury must be a "commercial" injury, and not a "consumer" injury. *See Colligan v. Activities Club of N.Y., Ltd.*, 442 F.2d 686, 692 (2d Cir. 1971).  "Congress' purpose in enacting § 43(a) was to create a special and limited unfair competition remedy, virtually without regard for the interests of consumers generally and almost certainly without any consideration of consumer rights of action in particular." *See id.*  As the

Second Circuit has held, "The Act's purpose, as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct." *Id.*

The SAC asserts that the Plaintiffs were damaged by the "false and misleading inflated [*sic*] descriptions or representations of fact concerning the circulation figures . . . ." (SAC ¶ 256.) Nowhere in Count VII do the Plaintiffs allege that they were in direct, or even indirect competition with Defendants (*See id.* ¶¶ 255-59), nor could they. For, as Defendants point out, "Far from competing with Newsday or Hoy, plaintiffs allegedly operate(d), *inter alia*, restaurants, a medical practice, legal practices, and a musical instrument repair shop." (Defs.' Mem. at 23.) Thus, it appears that Plaintiffs are conflating "false advertising" with "fraudulently induced to purchase advertising." As Plaintiffs assert, "Plaintiffs, therefore, are entitled to recompense under the Lanham Act because defendants, by such fraudulent conduct, have thwarted plaintiffs' reasonable expectations of receiving a product, namely advertising space, at a fair price." (Pls.' Opp'n Mem. at 40.) By their own account, Plaintiffs' claims are those of unhappy consumers, not competitors. As such, they lack standing under the Lanham Act. *See, e.g., Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 659 (S.D.N.Y. 1996) ("The courts' refusal to allow consumers standing to sue under § 1125(a) stems from the recognition that one problematic consequence of extending the Lanham Act coverage to consumers would be the transformation of the federal court system into a veritable small claims court.") (citations and quotation marks omitted), *aff'd* 113 F.3d 1229 (2d Cir. 1997).

In sum, the Plaintiffs are consumers of Defendants' product and advertising, and not competitors. As consumers, they lack standing under § 43(a) of the Lanham Act. Accordingly, the Court grants Defendants' motion to dismiss Count VII.

### V.    *Plaintiffs' Common Law Claims*

The supplemental jurisdiction statute provides that "district courts may decline to exercise supplemental jurisdiction" when "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  Granting the moving Defendants' motions to dismiss each of the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  Plaintiffs are, of course, free to pursue those causes of action in state court.

### *CONCLUSION*

Leave to amend should be freely granted, especially in the case of a Rule 9(b) dismissal.  *See Chill v. Gen. Elec.*, 101 F.3d 263, 271 (2d Cir. 1996).  Because there is clearly no merit to the Lanham Act claim, Count VII is hereby dismissed without leave to amend.  With regard to the RICO claims, the Court finds it difficult to imagine how Plaintiffs could adequately plead a RICO violation.  Nevertheless, the Court accepts the possibility that Plaintiffs' imagination exceeds its own.   Thus, in accordance with the foregoing, Corporate Defendants and Individual Defendants Foley, Langer, Halfmann, Brennan, Sito, and Pothoff's 12(b)(6) motions to dismiss are GRANTED, but Plaintiffs are GRANTED leave to amend as to Counts I through V.

**SO ORDERED.**

Dated: Central Islip, New York
       March 3, 2006                                    _____/s/_____
                                                                 Denis R. Hurley
                                                                 United States District Judge