UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

CRABHOUSE OF DOUGLASTON INC. d/b/a
DOUGLASTON MANOR, *et al.*,

                          Plaintiffs,

       - against -


NEWSDAY INC., *et al.*,

                         Defendants.
--------------------------------------------------------X

**MEMORANDUM & ORDER**
**04 CV 558 (DRH)(WDW)**

**Appearances:**

**Joseph O. Giaimo**
Attorney for Plaintiffs
80-02 Kew Gardens Road
Kew Gardens, New York 11415

**Harwood Feffer LLP**
Attorneys for Plaintiffs
488 Madison Avenue, Suite 801
New York, New York 10019
By:  Samuel K. Rosen
    Joel C. Feffer
    Robert I. Harwood

**Sidley Austin LLP**
Attorneys for Defendants Newsday, Hoy, Distribution Systems of America, Harold Foley, and
Thomas Langer
787 Seventh Avenue
New York, New York 10019
By:  Robert W. Hirth
    Daniel A. McLaughlin

**DeFeis O'Connell & Rose, P.C.**
Attorneys for Defendant Keith Potthoff
500 Fifth Avenue, 26th Floor
New York, New York 10110
By:  Philip C. Patterson
    Gregory J. O'Connell

**Clifford Chance US LLP**
Attorneys for Defendant Robert Halfmann
31 West 52nd Street
New York, New York 10019
By: David Meister
    Mark A. Weissman

**Dechert LLP**
Attorneys for Defendant Robert Brennan
30 Rockefeller Plaza
New York, New York 10112
By: Edward A. McDonald
    Matthew J. Lang


**HURLEY, District Judge:**

Before the Court are five motions to dismiss plaintiffs' fourth amended complaint. (*See* docket nos. 141, 143, 149, 150, 151.)  The Court previously granted defendants' motions to dismiss the second amended complaint ("SAC"),[1] dismissing all claims under the Lanham Act with prejudice, dismissing all claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, without prejudice and with leave to amend, and temporarily declining jurisdiction on plaintiffs' state law claims.  Plaintiffs have since amended their complaint and defendants now move again to dismiss pursuant to Fed R. Civ. P. 12(b)(6). For the reasons that follow, defendants' motions are granted in part, and denied in part.


## BACKGROUND

The allegations set forth in plaintiffs' fourth amended complaint ("FAC") are substantially similar to the prior pleadings in this case,[2] the underlying facts of which have been articulated in more detail in the Court's previous Memorandum & Order. *See Crab House of*

---

[1] Plaintiffs label their most recent pleading as the fourth amended complaint (docket nos. 111-14), even though no third amended complaint was ever filed.  Plaintiffs attribute this mislabeling to a "scrivenor's error." (Pls.' Memo in Opp., n. 1.)
[2] To the extent that there are material differences, those differences are discussed in the text *infra*.

*Douglaston, Inc. v. Newsday, Inc.* ("*Crab House I*"), 418 F. Supp. 2d 193 (E.D.N.Y. 2006). Some familiarity with the underlying facts of this case is therefore assumed. In a nutshell, plaintiffs' claims arise from an alleged scheme by defendant news publications Newsday, Inc. ("Newsday"), Hoy, LLC ("Hoy"), and their distributors, as well as various employees to inflate the reported circulation numbers for their publications and "advertising flyers" by as much as 50 percent. (FAC ¶¶ 1-6, 25.) It is alleged that by padding these numbers, defendants fraudulently drove up the rates they could charge advertisers.

Central to the implementation of the purported scheme was the Audit Bureau of Circulation ("ABC"), an independent, non-profit entity responsible for auditing the reported circulation numbers of Newsday, Hoy, and a host of other news publications. ABC publishes biannual audited circulation reports upon which advertisers, including plaintiffs, rely in estimating both the effectiveness of their advertising in a particular publication and the market rate for placing such advertisements. The alleged fraud is said to have involved defendants submitting false circulation reports to ABC, taking various measures to create the appearance that those circulation reports were valid when later audited by ABC, and using the final audited reports published by ABC to substantiate the bogus circulation claims made to potential advertisers.

The named plaintiffs bring this action on behalf of themselves and a class consisting of other businesses that placed advertisements in the publications beginning in 1995 and continuing through the date plaintiffs filed their FAC. (*Id.* ¶ 15.) They allege eight causes of action, with the first five charging substantive RICO violations under 18 U.S.C. § 1962(c)[3] [Counts I and III] and

---

[3] 18 U.S.C. § 1962(c) states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

RICO conspiracy violations under 18 U.S.C. § 1962(d)[4] [Counts II, IV, and V], with the remaining three being causes of action under state law, to wit, unjust enrichment, fraud, and New York General Business Law § 349.

The "Company defendants," as they are referred to in the FAC, include the two publication companies Newsday and Hoy, and their distributor, Distribution Systems of America, Inc. ("DSA").[5] The FAC also brings claims against a number of named and unnamed individuals. The named individuals (the "Individual defendants")[6] include:

1) Louis Sito ("Sito"), President and Publisher of Hoy, Executive Vice President for Circulation for Newsday, and National Director Of Hispanic Publications for The Tribune Company, the parent company for the three Company Defendants;[7]

2) Robert Brennan ("Brennan"), Vice President of Circulation for Newsday, and "overall director" for circulation and sales of Newsday, Hoy, and DSA;

3) Robert Garcia ("Garcia"), Circulation Director for Hoy;

4) Robert Halfmann ("Halfmann"),[8] "employee, agent, and sales representative" of the Company Defendants;

5) Fred Herb ("Herb"), also an "employee, agent, and sales representative" of the Company Defendants;

6) Keith Potthoff ("Potthoff"), an "employee and agent of Company Defendants," as well as General Manager of DSA.

7) Harold Foley ("Foley"), a computer programmer and independent contractor to the Company Defendants;

---

[4] 18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

[5] DSA distributed the Newsday and Hoy newspapers to readers, as well as advertising flyers to residences.

[6] Because defendant Sito has settled his claims (*see* following footnote), and because defendants Garcia and Langer have not responded to the FAC or any other pleading in this case (*see* section VII *infra*) the term "Individual defendants" as it is used in this decision shall refer exclusively to defendants Brennan, Halfmann, Potthoff, Foley, and Langer.

[7] Since this pleading was filed, defendant Sito settled all claims asserted against him in the FAC without prejudice. (FAC ¶ 135.)

[8] Defendant Robert Halfmann's last name is misspelled "Haufman" in the FAC.

8) Thomas Langer ("Langer"), and independent contractor and financial systems consultant to the distribution companies that preceded DSA.

According to the FAC, defendants Sito, Brennan, and Garcia were all terminated from the Tribune Company in 2004, and pled guilty in 2006 for conspiracy to commit mail fraud in connection with the scheme alleged here. (FAC ¶¶ 107, 113, 115, 119, 120, 124.) The FAC defines "one or more" of the John/Jane Doe defendants as "a high-level officer, director, employee, representative and agent of one or more of the Company Defendants," and a "managing member of the Circulation Enterprise." (FAC ¶ 143.)

## DISCUSSION

### I. STANDARD OF REVIEW

Rule 8(a) provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has recently clarified the pleading standard applicable in evaluating a motion to dismiss under Rule 12(b)(6). To survive a motion to dismiss [under 12(b)(6)], a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[9]

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

---

[9] Although the FAC was filed before the Supreme Court decided *Twombly* and *Iqbal*, the Court nevertheless applies the heightened pleading standards articulated in those cases here. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143 (2d Cir. 2007)(applying *Twombly* retroactively to a case heard before, but decided after, *Twombly* was rendered).

*Id.* at 555-56 (citations and internal quotation marks omitted).

First, in assessing a party's complaint the Court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 566 U.S. ---,129 S. Ct. 1937, 1950 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555).

Second, "[w]hen there are well-pleaded factual allegations a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. The Court defined plausibility as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 1949 (quoting and citing *Twombly*, 550 U.S. at 556-57).


## II.    RICO GENERALLY

RICO is a broadly worded statute that "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617, at 76 (1969); *see* Statement of Findings and Purpose, Organized Crime Control Act of 1970,  Pub. L. 91-452, 84 Stat. 922, 922-23 (1970); *see also*

*Attorney Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001). "RICO provides that '[a]ny person injured in his business or property by reason of' a RICO violation may bring a civil action to recover treble damages." *Canada*, 268 F.3d at 107 (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) (quoting 18 U.S.C. § 1964(c))).

To plead a violation of § 1962(c), the sole substantive RICO claim alleged in the FAC, plaintiffs must allege injuries arising from "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001); *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994). The first two elements, as they pertain to the instant case, are examined in the section to follow; the latter two are discussed in section IV below.

## III.    CONDUCT OF THE RICO ENTERPRISES

"Any principled analysis of a RICO claim [ ] must begin from an understanding of what enterprise is alleged." *Spira v. Nick*, 876 F. Supp. 553, 561 (S.D.N.Y. 1995). One violates RICO where "a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participate[s] in an enterprise . . . ." *DeFalco,* 244 F.3d at 306; *see Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)("Under [§1962(c)], the RICO 'person' must conduct the affairs of the RICO 'enterprise' through a pattern of racketeering activity."). The term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4).

Plaintiffs here allege the existence of four racketeering enterprises within the meaning of § 1961(4). The first three are standalone corporate enterprises, namely: the "Newsday Enterprise," consisting of defendant Newsday; the "Hoy Enterprise," consisting of defendant Hoy; and the "ABC Enterprise," consisting of ABC. Plaintiffs also allege the existence of an "association-in-fact" enterprise, which they label as the "Circulation Enterprise." The Court begins its analysis with an examination of the ABC enterprise.

### a. The ABC Enterprise

Defendants argue that plaintiffs' claims as to the ABC enterprise should be dismissed because they failed to allege that defendants actually "conduct[ed] or participat[ed], directly or indirectly, in the conduct of such enterprise's affairs." *See* 18 USC § 1962(c). The "conduct" element requires that "one [ ] participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993).

> Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise; but some part in directing the enterprise's affairs is required.

*First Capital Asset Mgmt. Inc. v. Satinwood. Inc.,* 385 F.3d 159, 176 (2d Cir. 2004)(quoting *Reves,* 507 U.S. at 185); *see also Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191, 2001 U.S. Dist. LEXIS 10814, at *11 (S.D.N.Y. July 31, 2001)("There is a 'substantial difference' between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves*.").

Although the *Reves* "operation or management" test sets forth a "low hurdle to clear at the pleading stage," *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 449 (2d Cir.

2008), *overruled on other grounds by Hemi Group, LLC v. City of New York*, --- U.S. ---, 130 S. Ct. 983, 994 (2010), plaintiffs have not cleared that hurdle vis-à-vis their allegations pertaining to the ABC Enterprise.

Plaintiffs claim that defendants primarily controlled the affairs of ABC by mailing fraudulent circulation numbers to ABC. ABC, in turn, relied on those false numbers and incorporated them into the audit circulation reports that it later published. Although the false circulation reports submitted to ABC likely affected the content of the final audit reports that ABC published, to suggest that this effect is tantamount to participating in or conducting the operation or management of the entity is a bridge too far. ABC stood at arm's length to defendants in its relationship as auditor, and defendants' submission of false information alone would not have changed the tenor of that relationship, or altered the internal processes by which ABC authenticates the information that it receives. In this context, without affecting such internal processes and affairs of ABC, defendants cannot be said to have met the "conduct" requirements set forth in *Reves*.

Other courts have come to similar conclusions in analogous scenarios. For example, in *In re Smithkline Beecham Clinical Lab.*, 108 F. Supp. 2d 84 (D. Conn. 1999), it was alleged that the defendant, a medical laboratory company, conducted the affairs of the hospitals and doctors' offices to which the defendants sent fraudulent billing invoices. The court concluded that "although [the] alleged fraudulent billing practices may have victimized the physicians' offices, hospitals, and laboratories, that does not suffice to establish that [defendant] 'operated or managed' the affairs of each of these alleged enterprises." *Id.* at 100. Similarly, in *Allstate Insurance Co. v. Seigel, 312* F. Supp. 2d 260, 275 (D. Conn. 2004), plaintiff insurance company brought RICO claims against a physician and his medical services company for submitting false

invoices for medical services that were never actually performed. There, the Court noted that "any time a company is defrauded by the conduct of a defendant, one could say that the defendant 'controlled' the company's operations, since absent the fraud, the company would not have done what it did or acted in the manner in which it did. Such a free-wheeling interpretation of the operation and management test would appear to be inconsistent with *Reves*." *Id.; see also Reves,* 507 U.S. at 185 ("[RICO] cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs.").

Plaintiffs allege that defendants conducted the affairs of the ABC Enterprise in two other ways. First, they allege that David Laventhal (not a defendant), the former president of Newsday, sat on the board of ABC during the 1990s and "participated in the formulation of the policies and practices of ABC," the details of which "await discovery." (FAC ¶ 174.) However, Laventhal's alleged participation on the board of ABC is not tantamount to participating in the operation or management of an enterprise as defined by the relevant case law.

As stated above, in order to participate in the operation or management of ABC in this case, the process by which ABC verifies submitted audit reports would have to have been affected. According to the FAC, ABC's board is composed of "persons employed as executives of nationally known advertisers, advertising agencies, business and farm publications, magazines, daily newspapers and weekly newspapers." (FAC ¶ 174.) Any attempt to enact policies or practices that would weaken or, in plaintiffs' words, "subvert" the organization's ability to audit claimed circulation numbers would be in direct conflict with the interests of other members of the board who represent advertisers. It is also arguably in conflict with the representatives of the other news publications who wish to preserve the integrity and level

playing field of a fully functioning audit agency. Plaintiffs' allegation that Laventhal could have effected such unilaterally favorable policies vis-à-vis Newsday in the environment described above is simply not plausible. *See Seigel*, 312 F. Supp. 2d at 275-76 ("[A] defendant will not be found to participate in the management or operation of the enterprise simply because he enjoys substantial persuasive power to induce the alleged enterprise to take certain actions.")(citing *Vickers Stock Research Corp. v. Quotron Sys., Inc.*, No. 96 Civ. 2269, 1997 U.S. Dist. LEXIS 10837 (S.D.N.Y. July 25, 1997)).

Second, plaintiffs allege that defendants affected the internal operations of ABC through its liaisons to ABC. Two individuals acted in this capacity: defendant Brennan, who served as a representative of the Newspaper Association of America to a committee at ABC and who also allegedly "participated in the formulation of the policies and practices of ABC," (FAC ¶ 174), and a non-defendant identified in the FAC as Ed Smith, who "entertained ABC auditors and became friendly with the auditors who compromised the thoroughness of ABC's auditing activities." (FAC ¶ 205.)

The allegations that Brennan conducted the affairs of ABC by influencing the policies and practices of ABC fail for precisely the same reasons that the allegations pertaining to non-defendant Laventhal failed. As to the allegations pertaining to Smith, according to the FAC, he would notify Newsday in advance of the actual date of an internal audit by ABC, and would allegedly know the specific delivery routes that would be inspected. This foreknowledge, plaintiffs claim, allowed defendants to prepare falsified circulation data for the particular route under investigation. Though this allegation identifies one of the many ways in which defendants perpetrated their fraud, it does not explain how Smith, or any other individual, actually participated in or conducted the affairs of ABC.

The FAC therefore fails to provide sufficient allegations that any defendant conducted or participated in the conduct of the ABC enterprise, and the allegations pertaining to that enterprise, as against all defendants, are therefore dismissed.

### b. The Circulation Enterprise

Plaintiffs' only substantive RICO claims against the Company defendants are brought under Count III of the FAC, which alleges that they conducted the affairs of the ABC Enterprise (discussed above), as well as the affairs of the Circulation Enterprise. The Circulation Enterprise is pled as an association-in-fact enterprise consisting of the following members:

1) The Company defendants (Newsday, Hoy, DSA) (FAC ¶ 285(3));
2) ABC (*id.*);
3) The Individual defendants (*id.*);
4) The John/Jane Doe defendants (*id.*);
5) The non-defendant distributors[10] that preceded DSA (Volmar Distributors Inc., American Media Distributors Inc., and United Media Distributors LLC)[11] (FAC ¶ 209(a)-(c));
6) Various unspecified non-defendant "executive, managerial or supervisory personnel," employees, agents, and independent contractors working within or for the marketing, promotional, circulation, sales and legal divisions of the Company defendants, ABC, and the non-defendant distributors (FAC ¶ 209(a)-(e));
7) Various non-defendant officers and employees of the Company defendants (see FAC ¶ 292 for a list of these individuals);

_____

[10] As the distribution companies changed throughout the years the alleged scheme took place, the Court will use the term "the Distributor" to refer to the particular distribution company (or variation thereof) that defendants Newsday and Hoy happened to have retained at a given time.

[11] While United Media Distributors LLC ("United") was named as a defendant in the SAC, United's status as a defendant is unclear in the FAC. The FAC caption, for example, includes United as a defendant and the pleading refers to the entity on more than occasion as a defendant. (*See e.g.,* FAC ¶¶, 285(3), 292.) The FAC elsewhere, however, appears not to name United as a defendant (*see e.g.,* FAC ¶¶ 100-02, 157), including the section of the FAC, which sets forth the causes of action, (*see* FAC ¶¶ 324-69 (Counts I-VIII)). Furthermore, counsel for United is under the impression that plaintiffs no longer intend to bring claims against the entity. (*See* Company Ds' Memo at 2, n.2.) As United is not listed as a defendant in the eight counts enumerated in the latter portion of the FAC, the Court construes the FAC as not having named United as a defendant.

8) Unidentified "third-party distributors, sub-distributors, marketers, [and] transporters" of Newsday, Hoy, and "advertising flyers," (FAC ¶ 290(f)); and

9) All "parents, subsidiaries, affiliates, and representatives" of the Company defendants and of United, (FAC ¶ 292).

"[T]he very concept of an association in fact is expansive," *Boyle v. United States,* --- U.S. ---, 129 S. Ct. 2237, 2243 (2009) ("The statute does not specifically define the outer boundaries of the 'enterprise' concept."). The definition of "enterprise" encompasses "an ongoing organization, formal or informal . . . legitimate or admittedly criminal," which "function[s] as a continuing unit . . . associated together for a common purpose of engaging in a course of conduct," *United States v. Turkette,* 452 U.S. 576, 583 (1981). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other' . . . [though they] may in particular cases coalesce" *Boyle,* 129 S. Ct. at 2245 (citing *Turkette,* 452 U.S. at 583). "[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Satinwood,* 385 F.3d at 174.

An association-in-fact enterprise must also have some discernable elements of "structure," namely: "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle,* 129 S. Ct. at 2244. Further, the purpose or purposes of the enterprise must be common to all its members. *See Satinwood, Inc.,* 385 F.3d at 173 ("[E]xistence [of a common purpose] is proven by evidence . . . that the various associates function as a continuing unit.") (citing *Turkette,* 452 U.S. at 583).

Further, an enterprise must function separate and distinct from the person who allegedly conducts the racketeering activity of that enterprise. *DeFalco*, 244 F.3d at 307. Under this "distinctness" requirement, "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)." *Riverwoods*, 30 F.3d at 344. However, "[t]his does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself." *Id.*; *Cullen v. Margiotta*, 811 F.2d 698, 729-730 (2d Cir. 1987)("[W]e see no reason why a single entity could not be both the RICO 'person' and one of a number of members of the RICO 'enterprise.'"). Nevertheless, the distinctness requirement cannot be circumvented,

> by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant . . . . Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.

*Cedric Kushner Promotions Ltd. v. King*, 219 F.3d 115, 116 (2d Cir. 2000), *rev'd on other grounds by* 533 U.S. 158 (2001), (quoting *Riverwoods*, 30 F.3d at 344).

Presumably to address this distinctiveness rule vis-à-vis their allegations against the Company defendants, plaintiffs include ABC as a member of the Circulation Enterprise. This addition is crucial because without the presence of ABC, the enterprise merely consists of the three Company defendants and their respective agents and employees. Though the prospect of an enterprise consisting solely of the Company defendants and their agents may appear to comport with the distinctiveness requirement (i.e. there are ostensibly three separate companies

and three distinct sets of employees/agents), this is not actually the case. The three Company defendants are each wholly owned subsidiaries of the Tribune Company. (FAC ¶ 100-02.) As explained in this Court's prior decision, wholly owned subsidiaries are not distinct from their parent company for the purposes of alleging a RICO enterprise. *Crab House I,* 418 F.Supp.2d at 205. Where different "defendants [act] within the scope of a single corporate structure, guided by a single corporate consciousness[,] [i]t would be inconsistent for a RICO person, acting within the scope of its authority, to be subject to liability simply because it is separately incorporated." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996); *see Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc*., No. 07 Civ. 10490, 2009 U.S. Dist. LEXIS 32616 (S.D.N.Y. March 25, 2009)(holding that where a corporate RICO "person" and a corporate RICO "enterprise" shared *inter alia* a common ownership, they did not meet the distinctiveness requirement). The FAC sets forth facts that the Company defendants all shared a common owner as wholly owned subsidiaries of the Tribune Company, but does not set forth facts suggesting that they otherwise operated separately, or that they could be considered distinct entities. *Accord Crab House I*, 418 F.Supp.2d at 205.

The allegations against the Company defendants, therefore, necessarily hinge on successfully alleging an association-in-fact enterprise of which ABC is also a member, in other words an association-in-fact enterprise in which the membership is broader than the Company defendants and their employees or agents, and therefore sufficiently "distinct" from the Company defendants themselves. The Court's prior Order dismissing the second amended complaint found that the pleading failed to allege that ABC was a member of the Circulation Enterprise because it did not proffer facts that ABC shared a common purpose, lawful or unlawful, with the other members of that enterprise. *Crab House I*, 418 F. Supp. 2d at 203-06.

As will be discussed in more depth below, the same conclusion holds true for the current pleading.

      *i. The Members of the Circulation Enterprise Do Not Share a Common Lawful Purpose*

The SAC defined the *lawful* purpose of the Circulation Enterprise as "the legitimate business of planning, developing, marketing, selling, distributing, and managing the circulation of Newsday and Hoy and the delivery of flyers . . . ." (SAC ¶ 182.)  As stated in *Crab House I*, ABC could not have shared in that lawful purpose because plaintiffs specifically described ABC elsewhere in the pleading as "an independent auditing company and self-regulatory auditing organization engaged by and responsible to advertisers, advertising agencies and the media they employ, and various newspapers and magazine publishers throughout the United States, for the independent verification and dissemination of its members' circulation [statistics]." (*Id.* ¶ 95.) The independence and objectivity of ABC therefore ran counter to plaintiffs' conclusory assertion that ABC shared in the same endeavor as the "media outlets that it was supposed to oversee." *Crab House I,* 418 F. Supp. 2d at 205.

In an attempt to cure this defect in the SAC, plaintiffs now add a single word to their description of the Circulation Enterprise's purported lawful purpose in their most recent pleading.  In addition to planning, developing, marketing, selling, distributing, and managing the newspapers' circulation, the Circulation Enterprise, according to the FAC, was also engaged in "auditing." (FAC ¶ 286.)  This facile alteration of the stated purpose, however, does not create an association-in-fact enterprise.  Indeed, ABC does engage in "auditing," but the other members of the Enterprise, according to the facts pled in the FAC, do not; ABC is "independent" in that respect.  Likewise, the other members do in fact develop, market, and distribute the subject newspapers, but ABC takes to part in those tasks.  The respective purposes of these two groups

remain as mutually exclusive as they were in the prior pleading. Lumping these disparate functions together in the same descriptive sentence does not change this, nor does it allege a common purpose. *Cf. Frangipani v. HBO*, No. 08 Civ. 5675, 2010 U.S. Dist. LEXIS 27614, at *21 (S.D.N.Y. 2010)(A plaintiff cannot "satisfy [the] pleading requirement by stringing together independent acts by different entities and claim it was a joint undertaking for an illegitimate purpose."); *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001)("[C]onclusory naming of a string of entities does not adequately allege an enterprise.").

### ii. The Members of the Circulation Enterprise Do Not Share a Common Unlawful Purpose

In *Crab House I,* this Court held that the SAC also did not articulate a common unlawful purpose for members of the Circulation Enterprise. That unlawful purpose—*viz.* the artificial inflation of circulation numbers (SAC ¶¶ 182-83)—as a matter of law, could not have been shared by ABC because the prior pleading also defined ABC as a "victim" of that same unlawful undertaking. *Crab House I,* 418 F. Supp. 2d at 205. In their renewed pleading, plaintiffs again describe ABC as an "unlawfully victimized . . . innocent instrument of the Circulation Enterprise." (FAC ¶ 285(3)).

Plaintiffs argue in their opposition, however, that this characterization is not fatal to the existence of the Circulation Enterprise. In support, plaintiffs cite to *DeFalco*, 244 F.3d 286, for the proposition that an enterprise is "often a passive instrument or victim." *Id.* at 306-09. However, *DeFalco* is not instructive for present purposes. The plaintiffs in *DeFalco* brought an action under 28 U.S.C. 1962(c) charging "a conspiracy, plan and scheme among the defendants – and an assortment of public officials, private individuals and corporations – to use the Town of Delaware as a racketeering enterprise to extort money, real property and personal property

through the misuse of public officers." 244 F.3d at 293. In that case, the RICO persons were the public officials, and the alleged RICO enterprise was the Town of Delaware. The relevant questions then before the Circuit were (1) whether the individual RICO persons were distinct from the enterprise, and (2) whether the Town of Delaware, a public entity, could be considered a single-entity RICO enterprise. The Circuit answered both questions in the affirmative. *Id.* at 307-09.

We consider a very different question here. The present question is not, for example, whether a public entity can be a single RICO enterprise, nor is the question whether any of the individual entities involved in the scheme now alleged can be considered an enterprise by themselves. There is no dispute that Newsday, Hoy, or ABC (all distinct corporate entities) are each RICO enterprises – clearly, they are. Rather, the relevant question now under consideration is whether these entities together, and in combination with numerous other individuals (enumerated *supra*), may also combine to form a separate *association-in-fact* enterprise. *See* 18 U.S.C. § 1961(4) (defining an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, *and* any union or group of individuals associated in fact although not a legal entity")(emphasis added). For plaintiffs to plead an association-in-fact enterprise, the members of such enterprise must have a common purpose. Though *DeFalco* supports the proposition that a single RICO enterprise may also be a victim of the purported criminal activity, it does not support the proposition that a victim of said activity may share in the unlawful purpose of conducting that activity with fellow members of an association-in-fact enterprise.

Plaintiffs also cite to a case where the Second Circuit held that an association-in-fact enterprise existed where its members included a victim of the very fraud perpetrated by the other

members of the enterprise. (Pls.' Opp. at 15)(citing *Jacobson v. Cooper*, 882 F.2d 717-20 (2d. Cir. 1989). There, however, the members of the association-in-fact enterprise all shared in a common lawful purpose: the business of real estate. And, as noted in *Turkette,* 452 U.S. at 583, "the term 'enterprise' as used in RICO encompasses both legitimate and illegitimate enterprises." As discussed above, however, the members of the Circulation Enterprise here do not share a common lawful purpose.

To show that an unlawful goal may be shared between a victim and its perpetrators within the same association-in-fact enterprise, plaintiffs ventured outside the Circuit by citing *United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004), a case that involved a similar factual scenario to *DeFalco* (*i.e.* the manipulation of a public entity by private individuals and public officials), but which, as explained *infra*, involved a different type of enterprise. In *Cianci,* the defendants—the Mayor of Providence, Rhode Island, the City's Director of Administration, and a member of the City Towing Association, a private organization—were alleged to have conducted the affairs of an association-in-fact enterprise comprised of the defendants, the City of Providence, and numerous City offices and departments through a pattern of extortion, mail fraud, bribery, money laundering, and witness tampering. *Id.* at 82-84. In that case, the First Circuit held that "[a] RICO enterprise animated by an illicit common purpose can be comprised of an association-in-fact of municipal entities and human members when the latter exploits the former to carry out that purpose." *Id.* at 83. In such a scenario, the entities (in that case, the City and its departments) are said to be part of an "unlawful enterprise association-in-fact enterprise" without those entities actually forming an unlawful intent themselves. *Id.*; *see id.* at 83-84 ("[A] corporate or municipal entity does not have a mind of its own for purposes of RICO.").

Setting aside whether such a theory may be applied in this Circuit, its success necessarily hinges on whether certain members of the enterprise exerted enough control or manipulation on the corporate or municipal entity such that their interests can be said to have aligned. *See id.* ("The common purpose was dictated by individuals who controlled the [ ] entities' activities and manipulated them to the desired illicit ends . . . ."). In *Cianci*, there was evidence that the defendants "wielded influence, exerted pressure, and effectively controlled the City's various components." *Id.* at 83. Specifically, the City's government was clearly under the control of at least one other member of the enterprise, Vincent A. Cianci, the Mayor. Here however, as discussed above, defendants did not actually exert any control over the ABC enterprise. Therefore, even under the plaintiffs' proposed theory, the FAC still fails to demonstrate a common illicit purpose among all members of the Circulation Enterprise.

Furthermore, the allegations fail to set forth sufficient facts that that the members of the enterprise acted as a "continuing unit." *Turkette,* 452 U.S. at 583. Indeed, the complaint alleges in detail the autonomous role of ABC as an auditor for various news publications, including Newsday and Hoy. This alleged independent role, by its very nature, belies any notion that ABC acted with Newsday and Hoy, in a common undertaking. Although, the Supreme Court has expressly rejected the notion that a hierarchy must exist within the structure of an enterprise, there must be an "interpersonal" association among its members and a "common interest." *Boyle*, 129 S. Ct. 2237 at 2244. The relationship between ABC and the purported members of the Circulation Enterprise that it audits is fairly described as adversarial.

ABC therefore does not share a common purpose, lawful or unlawful, with the other members of the Circulation Enterprise. Without ABC as a member of this enterprise, as discussed above, the Company defendants, the RICO persons in this scenario, are not sufficiently

distinct from the Circulation Enterprise to confer RICO liability.  Count III, the sole substantive RICO claim against the Company defendants is therefore dismissed as to those defendants.

### iii. *The Viability of Claims Pertaining to the Circulation Enterprise as Against the Individual Defendants*

Counts I and III allege that the Individual defendants also conducted the affairs of the Circulation Enterprise.  A separate analysis from that applied to the Company defendants and their conduct of the Circulation Enterprise is required where the Individual defendants are involved.  Whereas a corporation cannot be considered the RICO "person" distinct from a RICO "enterprise" consisting of that corporation and its employees acting in the normal course of business, the same is not true in the situation where the "corporate employee is the 'person' and the corporation is the 'enterprise.'" *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).[12]  In such a scenario, the person and the enterprise are considered "distinct." *Id.* at 164 (distinguishing from the circumstances in *Riverwoods* where the "corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise'").

A consideration of the Circulation Enterprise without ABC therefore carries a different significance for the Individual defendants because they are sufficiently distinct from the enterprise while the Company defendants were not.  However, as discussed above, ABC may not be considered a member of the Circulation Enterprise.  Plaintiffs have not pled any other formation of the Circulation Enterprise, *i.e.* one without ABC, and it would be inappropriate for

---

[12] The *Kushner* decision further states:

> Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise,' particularly when the statute explicitly defines 'person' to include 'any individual . . . capable of holding a legal or beneficial interest in property,' and defines 'enterprise' to include a 'corporation.' 18 U.S.C. §§ 1961(3), (4). And, linguistically speaking, the employee and the corporation are different 'persons' . . . .

*Kushner*, 533 U.S. at 163.

the Court *sua sponte* to reconfigure plaintiffs' pleading. All allegations pertaining to the Circulation Enterprise are therefore dismissed.

### c.  The Newsday and Hoy Enterprises

The FAC alleges that the Individual defendants also conducted the affairs of the Newsday and Hoy Enterprises. (*See* FAC Count I.)  The alleged conduct of each Individual defendant pertaining to these remaining enterprises is analyzed below.

As an initial matter, there is a single allegation that is repeated verbatim against each of the Individual defendants.  The allegation states that "as an employee . . . [the particular defendant] participated in the . . . preparation, presentation, and distribution of Newsday and Hoy circulation and promotional materials for presentation by Individual Defendants [and other employees] to the Representative Plaintiffs and Class Members." (FAC ¶¶ 129, 134.)  This vague allegation of "participation" in the scheme is merely conclusory and devoid of detail – a form of pleading that cannot state a claim for relief.  *See Iqbal*, 129 S. Ct. at 1949 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.")

A second allegation asserted against defendants Halfmann, Langer, Herb, and Potthoff claims that these individuals provided "overall leadership, management and supervision of the circulation departments . . . for purposes other than the lawful sale of advertising space." (FAC ¶ 293.)  This same allegation was made in the SAC, and was dismissed because it made no attempt to distinguish one individual defendant from the other, and attributed no specific conduct to any of the defendants. *Crab House I*, 418 F. Supp. 2d at 209.  Precisely for that reason, this same allegation also fails to state a claim in the FAC.

*i. Defendant Foley*

Defendant Foley is identified in the current pleading as a "computer programmer and independent contractor" for the distributor. (FAC ¶ 128.)  In this capacity, Foley allegedly created two computer programs known as "Short" and "Fudge ABC," which were used to alter the distributor's weekly circulation reports and affidavits. (FAC ¶¶ 201, 218.)

The prior decision in this case dismissed a more anemic variation of this same allegation which claimed that Foley was a computer programmer "who created the Distributor's computer programs which were used for and during the distribution of Newsday and Hoy." 418 F. Supp. 2d at 209 (citing SAC ¶ 70).  That allegation, the Court explained, did nothing more than allege that Foley created a computer program, and therefore did not state a RICO claim. *Id.*

In the revised pleading, plaintiffs now allege that Foley was an employee of Newsday, Hoy, and DSA (FAC ¶ 129), and that while under the "direction and control" of defendants Sito, Garcia and Brennan, he "manipulate[d] the [Distributor's] computers so as to conceal from ABC the actual paid circulation volume . . . ." (FAC ¶ 128.)

Under the "operation-management" test set forth in *Reves,* in order to conduct the affairs of an enterprise, the defendant need "not act[] in a managerial role." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999). One "can still be liable for directing the enterprise's affairs if he exercised broad discretion in carrying out the instructions of his principal." *Id.* However, "the simple taking of directions and performance of tasks that are necessary or helpful to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *Id.* (citing *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994)); *see also United States v. Allen,* 155 F.3d 35, 42 (2d Cir. 1998)("In most of the cases in which we have held lower level employees to

be RICO participants, the defendant was shown to have played some management role in the enterprise.")(collecting cases).

As the FAC makes clear, Foley acted in his capacity as an employee under the "direction and control" of three superiors, in "carr[ying] out their directions" to manipulate the Distributor's computer reporting system. (FAC ¶ 128.)  The alleged facts do not suggest that Foley exercised any discretion in carrying out this task.  Rather, upon the direction of other defendants, he wrote a computer program that would conceal the actual paid circulation numbers by deleting records of unsold newspapers from the Distributor's computers.  The allegation suggests that the idea to use the computers to cover up the alleged scheme was entirely the artifice of defendants Sito, Garcia, and/or Brennan, not of Foley.  He merely created the program following the directive of these defendants and therefore did not conduct the affairs of either the Newsday or Hoy enterprises.

### ii.  Defendant Langer

Langer, however, appears to take a more active role in the conduct of these enterprises. For example, as Chief Financial Officer of the Distributor and an employee/agent of Newsday and Hoy, Langer and others would meet on a regular basis to instruct two individuals "as to the best method for Newsday to fraudulently adjust the Distributor's [ ] sales affidavits." (FAC ¶ 238.) Langer also allegedly intimated to Michael Pouchie, Executive Vice President of the Distributor, that it would be "better" for him to cooperate with Newsday and Hoy in helping to falsely inflate the circulation numbers. (FAC ¶ 247.)  These allegations paint a picture of an individual who actively directed the operation of the scheme, and therefore provides sufficient factual support to allege Langer's participation in the management and operation of these two enterprises.

### iii. Defendant Potthoff

The FAC asserts the same allegation against Potthoff as it did against Langer: that he instructed individuals on the best methods for altering the Distributor's sales affidavits. (FAC ¶ 238.)  The crucial difference between these two defendants, however, is that Pothoff apparently acted at the behest of defendants Brennan and Sito.  Potthoff, unlike Langer, therefore was merely carrying out the orders of higher-ups and was not, as a matter of law, directing the affairs of the enterprises in this regard.

Nevertheless, elsewhere in the pleading it is alleged that Potthoff told an employee for the Distributor to "dump" unsold Newsday papers instead of reporting them, thus creating the appearance of a higher sales volume. (FAC ¶ 222.)  There is no indication that this particular directive came from Potthoff's superiors, however, and the act does encompass the type of conduct that can be interpreted as directing the affairs of the two enterprises.

### iv. Defendant Halfmann

Curiously, two allegations pertaining to defendant Halfmann which were previously dismissed from the SAC found their way back into the most recent pleading. (*See* FAC ¶¶ 220, 252.)  The Court's prior decision dismissed plaintiffs' claim that "Green [a distribution manager] was systematically directed every few weeks by [Halfmann], to falsely inflate Newsday figures" because "this general allegation of supervision is directly undercut by the more specific assertion that Halfmann was a trainee [of Green]." *Crab House I,* 418 F. Supp. 2d at 209 (citing SAC ¶¶ 144, 107).  Not only does the FAC fail to remedy this contradiction, it remains unaddressed by plaintiffs' opposition brief.  This inconsistency is fatal to plaintiffs' claim in the FAC, just as it was in the prior pleading. *See Jones v. Nat'l Commun. & Surveillance Networks,* 409 F. Supp.

2d 456, 471 (S.D.N.Y. 2006) ("[T]he Complaint is not saved by conclusory allegations that are inconsistent with the facts pled, or a common sense understanding of those facts.")

The remaining allegation pertaining to defendant Halfmann's conduct of the enterprises is found in paragraph 200 of the FAC. There, plaintiffs allege that "Green changed the affidavit [of weekly distribution numbers] with his trainees, Defendants Herb and [Halfmann]." (FAC ¶ 200.) The paragraph, however, continues on to explain that it was defendants Garcia and Sito who would actually "change" the numbers in the affidavit "so as to increase the sales figures," and that Garcia's secretary would "make the physical changes and she delivered the altered affidavit to Company defendant Newsday." (*Id.*) Read together, it is unclear that Halfmann had any role in this component of the overall scheme, as defendants Garcia and Sito appear to have taken the primary directive role, and Garcia's secretary appears to have executed their instructions. Furthermore, as the allegation states, any involvement by Halfmann herein was in his capacity as Green's trainee. For these reasons, the FAC does not allege sufficient facts that Halfmann conducted the affairs of either the Newsday or Hoy enterprises. The allegations brought against him in Count I of the FAC are therefore dismissed.

### v. *Defendant Brennan*

In his opposition brief, defendant Brennan contends that the allegations in the FAC regarding his purported conduct of the two enterprises are fundamentally flawed because they still fail to attribute conduct directly to him. (Memo of Law in Support of Brennan's Motion to Dismiss ("Brennan Memo"), 5-6.) However, the current allegations against Brennan largely rectify the infirmities that were present in the SAC. As the Court previously held, the allegations in the SAC failed to allege direct wrongdoing against Brennan because (1) they were

stated in the disjunctive and thus did not attach factual allegations to a particular defendant, *see Crab House I*, 418 F. Supp. 2d at 208 (quoting SAC ¶ 119)("Green was systematically directed every few weeks by Defendant Garcia *or* Defendants Langer, [Halfmann], Herb, and Brennan . . . ."), and (2) the allegations did not "distinguish Brennan in his legitimate capacity as a supervisor within Newsday, and Brennan in his illegitimate capacity as a director or manager of the enterprise," 418 F. Supp. 2d at 208 (quoting SAC ¶ 155)("Neshat worked under the direct supervision of Defendant Brennan").

The current pleading, however, is on much better footing. Paragraph 114 of the FAC, for example, states that "Brennan acted jointly with Sito and directed and supervised the other Individual Defendants . . . to make fraudulent circulation reports to ABC, and to prepare false and fraudulent circulation and promotional material" to send to plaintiffs. (FAC ¶ 114.) Brennan argues that this claim fails again to attribute direct conduct. (Brennan Memo at 6.) The Court disagrees. The allegation makes a straightforward claim that Brennan and Sito both engaged in actionable conduct, *viz.* directing employees to produce false audit reports and fraudulent mailings. This newer version is also not hobbled by the same disjunctive construction found in the prior pleading. Elsewhere, the FAC also sufficiently alleges that Brennan conducted the affairs of the enterprises by (1) directing his "subordinates at Newsday to overstate paid circulation numbers and to submit the resulting false information by mail and private commercial interstate carrier to ABC . . . ." (FAC ¶ 117), (2) staging "a 'recreation' in which [Brennan] and others dispatched Newsday employees [under] the guise of customers to buy Newsday newspapers from sellers who had been stationed at locations throughout Long Island" (*id.*), (3) directing Foley to "manipulate" the distributor's computers to reflect a higher-than-actual

volume of circulation (FAC ¶ 128),[13] and (4) creating the false audit reports with others (FAC ¶ 143). These allegations, together and standing alone, sufficiently allege Brennan's participation in the operation and management of the enterprises.

## IV.    PATTERN OF RACKETEERING: MAIL FRAUD

The Court now turns to the third and fourth elements of the plaintiffs' substantive RICO claims: "the commission of two or more acts constituting a pattern of racketeering activity."  The pattern of racketeering alleged by plaintiffs in their RICO claim is mail fraud.  To bring such a claim, plaintiffs must allege "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  Because such an allegation involves claims of fraud, it must also meet the "particularity" requirement of Rule 9(b), Fed. R. Civ. P.  Specifically, the pleading must: "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)(quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

"To constitute a [mail or wire fraud] violation . . . it is not necessary to show that [defendants] actually mailed . . . anything themselves; it is sufficient if they caused it to be done." *Smokes-Spirits.com*, 541 F.3d at 446 (citing *Pereira v. United States*, 347 U.S. 1, 8

---

[13] Brennan argues that this allegation fails to distinguish between his legitimate and illegitimate roles within the enterprise.  His assertion, however, misunderstands the finding of this Court in the prior decision.  There, plaintiffs alleged only that a subordinate performed fraudulent acts during the time that Brennan supervised him.  Though that allegation created a strong inference of misconduct, it did not actually allege wrongdoing by Brennan and was dismissed accordingly. *Crab House I*, 418 F. Supp. 2d at 208.  The current allegation by contrast states that Brennan directed one of his workers to commit fraud, which, taken in the present context, adequately pleads Brennan's conduct of the enterprises.

(1954)).  "It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal quotation marks omitted).  A defendant need not mail a fraudulent letter so long as he was "acting with knowledge that the use of the mails will follow in the ordinary course of business, and that the use of mail could have been reasonably foreseen." *Baisch v. Gallina*, 346 F.3d 366, 374 (2d Cir. 2003)(internal quotes and citations omitted).

Plaintiffs allege that defendants used the mail in furtherance of their scheme in a number of ways, including: (1) by mailing promotional and marketing materials to certain plaintiffs, (2) by mailing plaintiffs invoices which contained the inflated advertising figures, and (3) by causing plaintiffs to mail checks in payment of those invoices back to defendants. (FAC ¶¶ 18-99.)

An essential component of the overall scheme of fraud alleged by plaintiffs was the use of the falsely inflated circulation numbers published by ABC to induce the advertising plaintiffs to pay a higher rate for advertising space.  Part of inducing potential customers to pay this higher rate was the mailing of promotional and marketing materials to plaintiffs which contained ABC's false audit numbers. (*See e.g.,* FAC Exs. D & E; *see also* FAC ¶ 106 ("Representative Plaintiffs and Class Members . . . justifiably relied upon such promotional materials and marketing reports and ABC audit certifications."); FAC ¶ 104 ("Advertisers depended on ABC-audited paid circulation data to negotiate advertising rates with publishers, including Newsday and Hoy.")).

The FAC details this aspect of the scheme from the perspective of each of the named plaintiffs.  Each allegation states that defendants "used the U.S. mail to deliver promotional material" to the plaintiff which "boasted of Newsday's and Hoy's fraudulently inflated paid circulation volume," upon which each plaintiff relied in paying the fraudulent advertising rates. (FAC ¶¶ 23, 34, 43, 52, 61, 69, 78, 86.)  Attached to the FAC are examples of the promotional

materials mailed to plaintiffs. (FAC Exs. D & E).[14] These materials make a number of misrepresentations regarding the circulation numbers for both Newsday and Hoy, all of which are purported to be certified by ABC, and all, plaintiffs allege, overstate the actual circulation volume of these publications by as much as 50 percent. (FAC ¶ 25.)

Although the allegations do not provide the exact dates that the materials were mailed to plaintiffs, they do provide date ranges. The duration of these date ranges varies greatly from plaintiff to plaintiff. Crab House, for example, who advertised with Newsday "from, or about, 1991 until January 2000 and in Hoy from December 1998 to June 1999" received the allegedly fraudulent promotional materials in the mail "from time to time and year to year from 1991 through 2000." (FAC ¶ 22.) At the other end of the spectrum, plaintiff Greenberg & Stein LLP received similar allegedly fraudulent materials "from December 2002 through August 2003." (FAC ¶ 85.) The parties are at odds as to whether these stated ranges satisfy the pleading requirements of Rule 9(b). Defendants argue that providing date ranges, as opposed to the actual dates of the mailings, falls short of plaintiffs' obligations under 9(b). Plaintiffs on the other hand contend that this level of particularity is sufficient, citing *In re Sumitomo Copper Litigation.*, 95 F. Supp. 451 (S.D.N.Y. 1998), for the proposition that "Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent be stated with particularity" so long as defendants allege "the specific circumstances constituting the overall fraudulent scheme." *Id.* at 456.

In my prior decision, I required that "any further pleadings must provide the level of detail and organization illustrated in *Moore*," *Crab House I*, 418 F. Supp. 2d at 212 (citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165 (2d Cir. 1999), in which the plaintiffs provided a

<hr />

[14] *See DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss [under] Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").

chart of twelve different mailings identifying those defendants responsible and the dates of the mailings with cross references to the appropriate paragraphs in the complaint. *See* 189 F.3d at 173. Though plaintiffs here do not provide that level of specificity, I am nevertheless inclined, upon further reflection, to conclude that the detail provided in the FAC passes muster for purposes of pleading.

In applying Rule 9(b) to allegations of mail fraud, district courts in this Circuit delineate between mailings that make specific "averments of fraud" and mailings that are simply made "in furtherance of the scheme," and those which are "themselves false or misleading." *Spira*, 876 F. Supp. at 559; *see also Allstate Ins. Co. v. Etienne*, No. 09-CV-3582, 2010 U.S. Dist. LEXIS 113995 (E.D.N.Y. Oct. 22, 2010); *AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 442-43 (S.D.N.Y. 2008)("Allegations said to be in furtherance of fraud are held to a different pleading standard entirely."); *Republic of Colom. v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 443 (E.D.N.Y. 2007); *Sumitomo,* 995 F. Supp. at 456. In the case of the former, "Rule 9(b) does not to require that the 'temporal or geographic particulars of each mailing made in furtherance of the fraudulent scheme be stated with particularity,' but only that the 'plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme.'" *AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-04-2934, 2005 U.S. Dist. LEXIS 29666, at *34 (E.D.N.Y. Feb. 22, 2005)(quoting *Sumitomo,* 995 F. Supp. at 456). The rationale for this approach is twofold: one, mailings made only in furtherance of a scheme are not technically allegations of fraud within the meaning of Rule 9(b); and two, the very purpose of applying Rule 9(b) to mailings in furtherance of the scheme is obviated where a plaintiff alleges the wider scheme with the requisite particularity. *Spira*, 876 F. Supp. at 559. As the court in *Spira* stated:

> [I]t is difficult to see any useful purpose in requiring that a RICO complaint specifically allege each mailing in furtherance of a complex commercial scheme, at least where, as here, the complaint alleges that numerous mailings of particular kinds were made in furtherance of the scheme. Once the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls.

*Id.*; *see also DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987)("Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits.").

As the Court stated in its prior decision, "[t]here is little question that Plaintiffs have pled a general scheme to defraud." *Crab House I,* 418 F. Supp. 2d at 211. Such allegations, as pled in the FAC, provide a detailed account of a plan executed by numerous individuals to give the appearance of inflated circulation numbers by manipulating computer systems and circulation logs, directly reporting overstated figures to the circulation auditor, staging "re-creations" when the auditors later investigate, and finally, openly misrepresenting the volume of circulation communications to potential advertisers. Plaintiffs allegedly relied to their detriment on statements made by defendants and their agents both orally and in writing, and on certifications of circulation numbers published by ABC. (*See, e.g.,* FAC ¶¶ 20, 27, 28, 104, 106.) The promotional materials at issue here were merely sent in furtherance of this larger scheme – a scheme which plaintiffs have already pled with the requisite particularity. Therefore, given the particularity in which plaintiffs have alleged the overarching scheme, the lack of precise dates for these mailings is not fatal to plaintiffs' allegations of mail fraud.[15]

---

[15] The Court is cognizant of the difference between the promotional materials, which contain purportedly fraudulent statements, and the invoices, which do not. Both, however, were mailed in furtherance of a well-pled scheme, and defendants have been provided with more than enough particularity regarding that scheme. The

Finally, a fair inference can be drawn that the Individual defendants against whom plaintiffs sufficiently allege RICO liability acted with the knowledge that mailing false representations of circulation numbers to potential advertisers would likely follow in the ordinary course of business. Thus, plaintiffs have adequately pled that the remaining defendants "caused" the mailings to occur. *See Baisch*, 346 F.3d at 374.

Accordingly, plaintiffs RICO claims alleged in Count I against defendants Brennan, Potthoff, and Langer survive. The same claims in Count I against Foley and Halfmann are hereby dismissed with prejudice.

## V.    CONSPIRACY CLAIMS UNDER §1962(d)

Plaintiffs allege three separate conspiracy claims in Counts II, IV, and V pursuant to 18 U.S.C. §1962(d). Section 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of subsections §1962(a)-(c).

### a.    Count II

Plaintiffs' conspiracy claims in Count II allege that each of the individual defendants conspired to violate §1962(c) as to all four enterprises. A RICO conspiracy claim requires an allegation that the defendant agreed to participate "'in a charged enterprise's affairs' through a pattern of racketeering, 'not a conspiracy to commit predicate acts.'" *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) (quoting *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987)).[16] The *Reves* "operation or management" test, however, does not apply to RICO

---

Court, therefore, need not impose an elevated pleading standard on the promotional mailings merely because they also happen to contain fraudulent statements. *See United Healthcare Corp.,* 588 F. Supp. 2d at 443 (requiring that the plaintiffs plead only the overall fraud scheme with particularity, even where the subject mailings in furtherance of the scheme also contained "various omissions and misrepresentations").

[16] Defendants' arguments on this point, by comparison, assert that the pleading does "not plead any facts showing that Brennan agreed that RICO predicate acts would be committed." (Memo of Law in Support of Defendant

conspicuity. 577 F.3d at 462 n.4. "Assuming that a RICO enterprise exists, [one] must prove only that the defendants . . . know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual roles." *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000)(quotes and citations omitted); *see also Salinas v. United States*, 522 U.S. 52, 64 (1997) ("A person . . . may be liable for [RICO] conspiracy even though he was incapable of committing the substantive offense."); *see id.* at 63 ("[D]efendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme.").

   i. *Plaintiffs' Conspiracy Claims Against the Individual Defendants Related to the Conduct of the ABC and Circulation Enterprises*

Analysis of these claims begins with the premise that any claim for conspiracy under §1962(d) necessarily fails where the underlying substantive claim is insufficiently pled. *See, e.g., Satinwood*, 385 F.3d at 182; *Cofacredit*, 187 F.3d at 244-45 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . .")(quoting *Salinas v. United States*, 522 U.S. 52,65 (1998)).

Count II includes allegations of a conspiracy by the individual defendants to conduct the affairs of the Circulation and ABC Enterprises through a pattern of racketeering. As the FAC fails to adequately allege (1) the existence of the Circulation Enterprise, and (2) that any of the defendants conducted the affairs of the ABC Enterprise, the conspiracy claims related to those substantive RICO claims must be dismissed.

---

Brennan's Motion to Dismiss at 10; *see also* Memo of Law in Support of Defendant Halfmann's Motion to Dismiss at 8 ("Plaintiffs do not plead any facts showing that Halfmann knowingly agreed to participate in a conspiracy to commit predicate acts, as the statute requires.").)

Additionally, Count II alleges that the Individual defendants conspired to conduct the affairs of the Newsday and Hoy Enterprises. Of the substantive claims against five of the individuals related to those enterprises analyzed above, two of these claims were dismissed because the FAC failed to allege sufficient facts that defendants Halfmann and Foley participated in the operation or management of the Newsday and Hoy Enterprises. This finding, however, does not preclude allegations of conspiracy against these two individuals. In fact, the general allegations against nearly all of these individual defendants plead enough facts to survive defendants' motion to dismiss the conspiracy claims. The FAC sets forth facts that each one of these individual defendants agreed to participate in a scheme whose ultimate objective must have been known to its participants, or so a jury could reasonably conclude. Even defendant Foley, who operated soley at the behest of his superiors, would have known that the purpose behind his task of manipulating the computer system to reflect a higher sales volume was to inflate artificially the reported circulation numbers. (*See* FAC ¶201 ("The Short program . . . was developed by Foley to record Newsday's sales and returns and render reports to Newsday for eventual use by ABC.")

As to the other Individual defendants, Brennan acted "jointly" with defendant Sito; Potthoff contributed to the dumping of unsold newspapers; and Langer would meet with others regularly to plot the best means of manipulating the circulation numbers. According to these alleged facts, these individuals did not act alone in furthering the goals of the overall scheme. Their motions to dismiss as to the Count II conspiracy claims are therefore denied.

The allegations against Halfmann discussed above (see section III (c)(iv) *supra*), however, are so murky and inconsistent, and his role in the scheme is so unclear, that the FAC

does not state ample facts to allege a conspiracy against him. Accordingly, the Count II conspiracy claim against him is dismissed.

### b. Count IV

Count IV alleges a conspiracy by all defendants, including the Company defendants, to conduct the affairs of the Circulation and ABC Enterprises through a pattern of racketeering. For precisely the same reasons discussed in section (V)(a)(i) above, the conspiracy claims in Count IV related to the Circulation and ABC Enterprises are hereby dismissed.

### c. Count V

Count V alleges conspiracy by all defendants to violate §1962(a) of the RICO statute.[17] The Court notes that plaintiffs did not bring a claim for violating subsection (a), nor have they pled facts that would permit the conclusion that had the alleged conspiracy's goal been realized, all of the elements of subsection (a) would have been met. In other words, plaintiffs have not alleged an injury separate and apart from the purported injury arising from the alleged mail fraud. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990)("[A] violation is not established by mere participation in predicate acts of racketeering. . . . [T]o state a claim for civil damages under § 1962(a), a plaintiff must allege injury from the defendants' investment of racketeering income in an enterprise."). Furthermore, the allegation claims that defendants used and invested income derived from the alleged scheme in the Circulation, ABC, Newsday and Hoy enterprises. However, a claim under §1962(a) is actionable only if the defendants "invested that income in the acquisition of a stake in, or establishment of, an enterprise distinct from the

---

[17] Section 1962(a) prohibits the "use or invest[ment], directly or indirectly" of any "income derived . . . from a pattern of racketeering activity" in an "enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

one from which the income was derived." *Leung v. Law*, 387 F. Supp. 2d 105, 120 (E.D.N.Y. 2005); *Falise v. Am. Tobacco Co.*, 94 F. Supp. 2d 316, 349 (E.D.N.Y. 2000) ("Where reinvestment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity."). Therefore, for the reasons indicated, plaintiffs' conspiracy claims under Count V are dismissed.

## VI. STATE LAW CLAIMS

### a. New York General Business Law

Count VIII of the FAC asserts claims for deceptive and unlawful practices under New York's General Business Law § 349 ("§349") against the Company defendants,[18] who have moved to dismiss those claims. To state such a claim, plaintiffs must allege: "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). An alleged act is "consumer-oriented" if it has "a broader impact on consumers at large." *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 330, 344, 725 N.E.2d 598, 604 (N.Y. 1999) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 647 N.E.2d 741, 744 (N.Y. 1995)); *see also Allstate Ins. Co. v. Bogoraz*, No. 10-CV-5286, 2011 U.S. Dist. LEXIS 63721 (E.D.N.Y. June 10, 2011). "Corporate competitors [ ] have standing to bring a claim under this [statute] . . . so long as some harm to the public at large is at issue . . . ." *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003)

---

[18] Although plaintiffs include the individual defendants in the header introducing this cause of action in the FAC, the specific allegation states that the "fraudulent acts committed by the Company Defendants Newsday, Hoy, and DSA as aforesaid, constituted a deceptive and unlawful practice. . . under the provisions of [§349]." (FAC ¶ 368.) The Court therefore construes plaintiffs' §349 claims to be alleged solely against the Company defendants.

(quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)) "[T]he gravamen of the complaint must be consumer injury or harm to the public interest." *Securitron*, 65 F.3d at 264.

Although plaintiffs bring their §349 claim on behalf of themselves and other purported class members as consumers of the Company defendants' advertising and distribution services, each plaintiff is a business, not an individual consumer. As the Company defendants correctly point out, these forms of private transactions between businesses do not fall within the broad consumer protections and public harm considerations contemplated by the subject statute. *See, e.g., Spin Master Ltd. v. Bureau Veritas Consumer Prods. Servs.,* No. 08-CV-923, 2011 U.S. Dist. LEXIS 43757 (W.D.N.Y. Mar. 4, 2011)(plaintiff's claims as a consumer of testing services and on behalf of other companies that may require product testing services did not allege "consumer-oriented" conduct by defendants); *Federated Retail Holdings, Inc. v. Sanidown, Inc.*, 2009 U.S. Dist. LEXIS 118700 (S.D.N.Y. 2009)(dispute between sales agent and manufacturer had "little to do with the 'consumer injury or harm to the public interest' that is required in order to give a non-consumer standing to bring such a claim"); *Blue Cross & Blue Shield*, 3 N.Y.3d 200, 818 N.E.2d 1140, (N.Y. 2004)(plaintiff third-party payer of health care costs could not recover damages in the form of higher costs to its subscribers because the statute does not cover such "derivative" claims); *but see Allstate Ins. Co. v. Rozenberg*, 590 F. Supp. 2d 384, 395 (E.D.N.Y. 2008) (allowing a §349 claim by an insurance company to proceed because "the alleged scheme would almost certainly result in higher premiums for insurance consumers.").

Plaintiffs do not allege that the purported acts of the defendants were "consumer-oriented within the meaning of the statute, or that the acts had a "broader impact on consumers at large."

(*See* Ps' Memo at 49-50.)  Defendants' motions to dismiss plaintiffs' claims pursuant to §349 are therefore granted.


### b.  Unjust Enrichment

Plaintiff brings claims for unjust enrichment against the Company defendants.  Although these defendants indirectly move to dismiss this claim by arguing that the Court should decline to exercise supplemental jurisdiction on all state law claims in the event that the federal claims are dismissed, they do not make any specific arguments that plaintiffs' unjust enrichment claims should not proceed.  The Court nevertheless evaluates the validity of those claims *infra*.

Under New York law, to make out a claim for unjust enrichment, a plaintiff must establish "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *State Farm Mutual Auto. Ins. Co.*, 375 F. Supp. 2d at 154.  Here, plaintiffs have adequately pled that the Company defendants were unjustly enriched "by the difference between the money [plaintiffs] paid for advertising space and the delivery of advertising flyers and what they would have paid if the circulation volume and flyer circulation volume had not been fraudulently inflated . . . ." (FAC Count VI.)


### c.  Common Law Fraud

Finally, plaintiffs allege common law fraud against all defendants.  "To successfully plead a common law fraud claim, plaintiff must allege a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the

plaintiff." *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). Again, the heightened pleading requirements of Rule 9(b) apply to such fraud claims.

As discussed above, with the exception of defendant Halfmann,[19] the FAC sets forth facts with requisite particularity detailing the alleged fraudulent scheme and each of the defendants' role in that scheme. Furthermore, the allegations "give rise to a strong inference of fraudulent intent" by the defendants. *See Satinwood,* 385 F.3d at 179. Defendants' motions to dismiss these claims are therefore denied.

## VII.    DEFENDANTS GARCIA AND HERB

Defendants Garcia and Herb have not answered or moved against either complaint filed in this case. In fact, these defendants have not taken any action since their attorney, Robert Hirth, requested to withdraw as their counsel, citing a conflict of interest. (*See* docket no. 61.) Defendants Garcia and Herb therefore appear to be in default, but plaintiffs have not taken any action against them. Therefore, by August 10, 2011, plaintiffs shall show good cause in writing why the Court should not dismiss the claims against these two defendants for plaintiffs' lack of prosecution.

---

[19] For primarily the same reasons discussed above in concluding that the allegations against Halfmann pertaining to the RICO claims fail to state a claim for relief, the fraud allegations against him also fail. Defendant Halfmann's motion to dismiss as to all claims asserted against him is therefore granted.

# CONCLUSION

For the reasons stated above, defendants' motions to dismiss are granted in part, and

denied in part, as follows:

**Count I** (Substantive RICO claims against the Individual defendants only)
- Dismissed as to defendants Halfmann and Foley, but survives as to defendants Brennan, Langer, and Potthoff.

**Count II** (RICO conspiracy claims pertaining to Count I against the Individual defendants only)
- Dismissed as to defendant Halfmann, but survives as to as to defendants Foley, Brennan, Langer, and Potthoff.

**Count III** (Substantive RICO claims against all defendants)
- Dismissed as to all defendants

**Count IV** (RICO conspiracy claims pertaining to Count III against all defendants)
- Dismissed as to all defendants

**Count V** (Conspiracy to violate 19 U.S.C. §1962(a) against all defendants)
- Dismissed as to all defendants

**Count VI** (Unjust enrichment claims against Company defendants)
- Survives as to those defendants.

**Count VII** (Common law fraud claims against all defendants)
- Dismissed as to defendant Halfmann, but survives as to all other defendants

**Count VIII** (Claims pursuant to N.Y. Gen. Bus. L. §349 against Company defendants)
- Dismissed as to all defendants


This matter is respectfully referred back to Magistrate Judge Wall for settlement talks,

and if no settlement is reached, for supervision of discovery and other pretrial matters.

SO ORDERED.

Dated: Central Islip, New York
      July 13, 2011                  _____/s_____
                                          Denis R. Hurley
                                          Unites States District Judge