UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CRAB HOUSE OF DOUGLASTON INC. d/b/a
DOUGLASTON MANOR, COLLEGE POINT
RESTAURANT, CORP. d/b/a GALLAGHER'S II,
RON BON PUB, INC. d/b/a GALLAGHER'S, ET
WEEK PUBLICATION, INC., GREENBERG &
STEIN, LLP, JOSEPH MAURO, PARALLEL
PRODUCTIONS, INC., PARK AVENUE
AESTHETIC SURGERY, PC, SCOTT A. RUSSO,
and TAG CATERING, INC., on behalf of
themselves and all similarly situated persons and
entities,

                                Plaintiffs,                    **MEMORANDUM AND ORDER**
                                                                04 CV 558 (DRH) (WDW)

          - against -

NEWSDAY, INC., HOY, LLC, UNITED MEDIA
DISTRIBUTORS, LLC, DISTRIBUTION SYSTEMS
OF AMERICA, INC., HAROLD FOLEY, ROBERT
GARCIA, THOMAS LANGER, ROBERT
HAUFMAN, FRED HERB, ROBERT BRENNAN,
LOUIS S. SITO, and KEITH POTTHOFF,

                                Defendants.
-------------------------------------------------------------------X
**APPEARANCES:**

**GIAIMO ASSOCIATES, LLP**
Attorneys for Plaintiffs
80-02 Key Gardens Road
Kew Gardens, NY 11415
By:     Joseph O. Giaimo, Esq.

**HARWOOD FEFFER LLP**
Attorneys for Plaintiffs
488 Madison Avenue, 8th Floor
New York, NY 10022
BY:     Robert I. Harwood, Esq.
        Samuel K. Rosen, Esq.

**SIDLEY AUSTIN LLP**
Attorneys for Defendant Newsday, Inc.
787 Seventh Avenue
New York, NY 10019
By:     Robert W. Hirth, Esq.
        Alan M. Unger, Esq.

**HURLEY, Senior District Judge:**

On September 28, 2006, plaintiffs filed their Fourth Amended Complaint ("FAC"), the

operative pleading in this action.  The asserted claims arise from purported fraudulent practices by

Newsday, Inc. ("Newsday"), Hoy, LLC ("Hoy"), and their distributors in inflating the reported

circulation numbers of their publications thereby driving up the rates Newsday and Hoy could

charge advertisers.  The fraudulent conduct is alleged to have occurred from mid-1995 through at

least the end of 2005.

By Memorandum & Order dated July 13, 2011 ("July 2011 Order"), the Court granted in

part and denied in part the defendants' motions to dismiss made pursuant to Federal Rule of Civil

Procedure ("Rule") 12(b)(6).  *See Crabhouse of Douglaston, Inc. v. Newsday*, 801 F. Supp. 2d 64,

93 (E.D.N.Y. 2011).   Based on the July 2011 Order and other developments in this case,

plaintiffs Crab House of Douglaston Inc. d/b/a Douglaston Manor ("Douglaston"), College Point

Restaurant, Corp. d/b/a Gallagher's II ("College Point"), Ron Bob Pub, Inc. d/b/a Gallagher's

("Ron Bob Pub"), ET Week Publication, Inc. ("ET Week"), Greenberg & Stein, LLP

("Greenberg"), Parallel Productions, Inc. ("Parallel Productions"), and Scott A. Russo ("Russo")

(collectively, the "plaintiffs")[1] bring the following remaining claims on behalf of themselves and

---

[1]  By Stipulation dated March 8, 2012, captioned plaintiffs Joseph Mauro and TAG
Catering, Inc. withdrew from the lawsuit.  (*See* Docket No. 198.)  In addition, captioned plaintiff
Park Avenue Aesthetic Surgery, PC settled its claims against defendants.  (*See* FAC ¶ 17.)

all others similarly situated: (1) violations of the Racketeer Influences and Corrupt Organizations Act of 1970 ("RICO") under 18 U.S.C. § 1962 (c) and (d) against Thomas Langer ("Langer"); (2) common law fraud against Newsday, Hoy, Distribution Systems of America, Inc. ("DSA"), and Langer; and (3) unjust enrichment against Newsday, Hoy, and DSA.[2]

Presently before the Court are three motions. First, Plaintiffs Douglaston, College Point, and Parallel Productions (hereafter, "moving plaintiffs")[3] move, pursuant to Rule 56, for partial summary judgment on their common law fraud claim against Newsday for the period January 1, 2001 through May 31, 2004 ("Summary Judgment Period").[4] Second, Defendant Newsday cross-moves for partial summary judgment on plaintiffs' unjust enrichment claim.[5] Third, plaintiffs move to certify this action as a class action pursuant to Rule 23(a) and (b)(3). For the reasons set forth below, the moving plaintiffs' motion for partial summary judgment is DENIED, Newsday's cross-motion for partial summary judgment is GRANTED in part and DENIED in part, and

---

[2] As for the other captioned defendants, they were either dismissed in the July 2011 Order (*i.e.*, Robert Halfmann (misspelled Haufman) and United Media Distributors LLC), voluntarily dismissed by plaintiffs (*i.e.*, Harold Foley, Louis S. Sito, Keith Potthoff, and Robert Brennan), or dismissed for failure to prosecute (*i.e.*, Robert Garcia and Fred Herb). The moving plaintiffs confirm that "[e]ach individual defendant in this action, other than Thomas Langer, has been dismissed from this action." (Pls.' Mem. at 4.) The Court also notes that defendants Hoy and DSA filed a Chapter 11 bankruptcy petition on December 15, 2008. Therefore, all claims brought against these entities are subject to an automatic stay.

[3] Plaintiffs Greenberg and ET Week are not movants as they did not advertise with Newsday. Plaintiffs Russo and Ron Bob Pub also do not seek summary judgment against Newsday at this time.

[4] The moving plaintiffs initially moved for summary judgment on their fraud and unjust enrichment claims, but have withdrawn that portion of their motion predicated on the unjust enrichment cause of action. (*See* Rosen Decl. ¶ 2.)

[5] Similar to the moving plaintiffs' motion for summary judgment, Newsday's cross-motion is not against plaintiffs Greenberg and ET Week as they did not advertise with Newsday.

plaintiffs' motion for class certification is DENIED.

***BACKGROUND***[6]

The following material facts are drawn from the parties' Local Civil Rule 56.1 Statements and evidentiary submissions.

At all relevant times, Newsday published and distributed the daily newspaper *Newsday*. (Pls.' 56.1 Stmt. ¶ 2.) The following plaintiffs advertised in *Newsday*: Parallel Productions placed advertisements from September 1999 until December 2000; College Point placed advertisements from the early 1990s until approximately 1997 or 1998; Ron Bob Pub placed advertisements from the early 1990s until sometime before December 2001; Douglaston placed advertisements from approximately 1978 until January 2002; and Russo placed advertisements from approximately 1992 until July 2004. (Def.'s 56.1 Stmt. ¶¶ 2, 7, 13-14, 19.)

Newsday's then Vice President of Advertising sent an annual letter to Newsday advertisers, addressed "Dear Advertiser," on the first of December for the years 2001, 2002, and 2003 (collectively, "Dear Advertiser Letters").[7] (Giamo Decl., Ex. 2.) In addition to providing the advertiser with a copy of Newsday's advertising rate card for the next calendar year, the Dear Advertiser Letters stated in relevant part: "Newsday leads in its market with more daily or Sunday circulation than the other area newspapers combined. In fact, Newsday has reported its [12th, 13th, or 15th] consecutive increase in daily and its [10th, 13th, or 15th] consecutive increase in Sunday

---

[6] While the facts presented in this Section are for purposes of the parties' motions for summary judgment, there is a great deal of overlap with those facts relevant to plaintiffs' motion for class certification. To the extent that additional facts are relied on in connection with plaintiffs' class certification, those facts will be addressed *infra*.

[7] For the years 2001 and 2002, the Vice President of Advertising was Patricia Burnagiel; for the year 2003, it was Kenneth Whitfield. (Giamo Decl., Ex. 2.)

circulation.[8]  (*Id.*)

A few years later, Newsday's publisher Timothy P. Knight sent a letter to Newsday

advertisers on July 27, 2007 ("July 2007 Letter") which stated the following:

> As I move into my new role as Publisher of Newsday, I wanted to let
> you know the progress of our investigation of circulation
> misstatements and the actions we are taking to regain your trust.  On
> June 17 we announced a problem with our circulation figures.  In the
> 39 days since then, we've continued our investigation and determined
> that our circulation figures for 2001-2004 were overstated.

(Giamo Decl., Ex. 1.)

In December 2007, Newsday entered into an Agreement with the U.S. Attorney's Office

for the Eastern District of New York ("U.S. Attorney Agreement") whereby Newsday

> acknowledge[d] that in or about and between 2001 and May 2004, as
> set forth in Exhibit A, . . . as a result of the conduct of certain Newsday
> and Hoy executives and employees, Newsday and Hoy violated
> criminal law by engaging in schemes that defrauded their advertisers,
> by systematically inflating paid circulation numbers reported in their
> books and records and falsely representing the accuracy of the inflated
> numbers to the Audit Bureau of Circulations ("ABC"), an industry
> organization.[9]

(Giamo Decl., Ex. 3 ("U.S. Attorney Agreement") ¶ 2.)  In Exhibit A to the U.S. Attorney

Agreement, Newsday admitted the following:

---

[8]  The bracketed numbers indicate the respective consecutive increases contained in each of the three Dear Advertiser Letters, namely the 2001, 2002, and 2003 letters.

[9]  ABC is a not-for-profit organization which "served as an industry watchdog to insure the integrity of paid circulation data submitted by publishers to advertisers."  (U.S. Attorney Agreement, Ex. A ¶ 2.)  ABC conducts independent third-party audits of circulation data reported to it in Publisher Statements.  (Pls.' 56.1 Stmt. ¶ 10; Def.'s CounterStmt. 56.1 ¶ 10.)

3.      From approximately 2001 until May 2004, senior managers of Newsday and subordinate employees under those managers' direction engaged in fraudulent practices that systematically inflated paid circulation numbers reported in Newsday's books and records and falsely represented to ABC that the inflated numbers were accurate. A goal of the scheme was to mislead ABC to verify by audit Newsday's claims that its paid circulation was increasing or at least not declining, and thereby, to induce certain advertisers to pay higher rates than accurate reports by Newsday to ABC would have justified.

4.      Among the fraudulent techniques used by Newsday managers and employees to inflate paid circulation numbers that they then reported to ABC was to make incentive and bonus payments to distributors of Newsday newspapers, ostensibly for bona fide performance, that were in fact conditioned on the distributors overstating the number of copies that they had actually delivered and understating the number of copies that had been returned by retail stores and hawkers because those copies had not been sold.[10]

(U.S. Attorney Agreement, Ex. A ¶¶ 3-4.)

## DISCUSSION

## I.      *Summary Judgment Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

---

[10]   While the affidavits of Robert Brennan and Louis Sito confirm the accuracy of certain allegations contained in the FAC regarding how the fraudulent conduct of inflating circulation figures was accomplished, such facts are not germane to the pending motions. The same can be said regarding the details of the fraudulent conduct contained in Scott Briggs' affidavit. Therefore, many of the objections by Newsday concerning the admissibility of the affidavits and other materials relied on by the moving plaintiffs need not be considered.

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, on conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The district court, in considering a summary judgment motion, must also be mindful of the underlying burdens of proof because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to present sufficient evidence in support of his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.   *Common Law Fraud*

To prove common law fraud in New York, a plaintiff must demonstrate that "(1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995). "[T]o recover in New York for misrepresentations made to a third party, the plaintiff must establish that he or she relied to his or her detriment on the misrepresentations and that the defendant intended those misrepresentations to be communicated to the plaintiff." *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 76-77 (2d Cir. 2000). "Each element of a fraud claim must be proved by clear and convincing evidence." *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 222 (2d Cir. 2006).

The moving plaintiffs argue that Newsday has admitted to misconduct which satisfies the elements of common law fraud for the Summary Judgment Period. In particular, the moving plaintiffs contend that Newsday admitted to its advertisers that during the Summary Judgment Period, it overstated its circulation figures with the goal of obtaining higher fees from those placing ads in *Newsday*. Based on Newsday's admissions, the moving plaintiffs' claim that there is no genuine dispute as to any material fact and that they are therefore entitled to judgment as a matter of law. Newsday, however, counters that the evidence does not demonstrate that it made material misrepresentations to the moving plaintiffs or that the moving plaintiffs relied on Newsday's representations.

### A.    *Newsday Admissions*

The moving plaintiffs' contention that Newsday admitted to liability on their common law fraud claim based solely on the admissions contained in the U.S. Attorney Agreement – or any other document for that matter – is legally and factually inaccurate. First, the fact that Newsday admitted to violating federal law by engaging in schemes that defrauded its advertisers is not dispositive of the moving plaintiffs' common law fraud claim. The federal fraud statutes at issue, namely mail and wire fraud, prohibit the use of interstate mail or wires to further a scheme to defraud. *See* 18 U.S.C. §§ 1341, 1343; *see also Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 332 (S.D.N.Y. 2009) ("The elements of mail and wire fraud are (1) the use of interstate mail or wires in furtherance of (2) a scheme to defraud (3) with money or property as the object.") Missing from the federal fraud statutes are the common law elements of reliance and that such reliance caused damages. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 24, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) ("[T]he fraud statutes did not incorporate *all* the elements of common-law

fraud.  The common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes.  By prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damages would clearly be inconsistent with the statutes Congress enacted." ); *U.S. v. Graham*, 477 F. App'x 818, 824 (2d Cir. 2012) ("[J]ustifiable reliance is essential to establishing civil liability for the type of fraud charged in this case.  It is not, however, an essential element of mail fraud or wire fraud under federal law").

Moreover, and as will be discussed in greater detail below, Newsday's limited admissions do not address certain essential elements needed to prove common law fraud, namely that the moving plaintiffs relied on material misrepresentations.  As the admissions in the U.S. Attorney's Agreement do not, standing alone, satisfy every element to common law fraud, the cases relied on by the moving plaintiffs are distinguishable.  For example, in *Fidelity Funding of California v. Reinhold*, 79 F. Supp. 2d 110, 115 (E.D.N.Y. 1997), certain defendants confessed to the plaintiff that they had submitted fraudulent invoices to the plaintiff.  Based on, *inter alia*, that admission, the court concluded that "there [was] no genuine issues of material fact regarding whether they committed each of the elements of fraud."  *Id.* at 117.  Here, Newsday's admissions do not amount to an admission of committing fraud against the moving plaintiffs.  While the U.S. Attorney Agreement is a significant piece of evidence for the moving plaintiffs in connection with their fraud claim, it does not, by itself, prove liability.  As such, the Court will turn to the individual elements of a common law fraud claim.[11]

---

[11]  Because the moving plaintiffs' motion fails on the first and third elements to a common-law fraud claim (*i.e.*, material misrepresentation and reliance), the Court has limited its analysis to just these elements.

### B.    Material Misrepresentation

The first element a plaintiff must demonstrate to prove common law fraud is that the defendant made a material misrepresentation.  *Colavito*, 438 F.3d at 222.  There are essentially two sets of statements identified by the parties: (1) inflated circulation figures falsely represented to ABC; and (2) statements made by Newsday to its advertisers in the Dear Advertiser Letters. Newsday does not contest that it misrepresented its circulation figures to ABC.  In fact, Newsday admitted in the U.S. Attorney Agreement that "[f]rom approximately 2001 until May 2004, senior managers of Newsday . . . engaged in fraudulent practices that systematically inflated paid circulation numbers reported in Newsday's books and records and falsely represented to ABC that the inflated numbers were accurate."[12]  (U.S. Attorney Agreement, Ex A ¶ 3.)  Newsday, however, contends that "there is no evidence – and plaintiffs offer no evidence – that the statements [in the Dear Advertiser Letters] concerning leading the market[] or reporting consecutive increases in circulation were false."  (Def.'s Opp'n at 9.)  The moving plaintiffs counter that these letters clearly contained false representations.  (Pls.' Reply at 1.)

Contained in the Dear Advertiser Letters are two representations: (1) "Newsday leads in its market with more daily or Sunday circulation than the other area newspapers combined[;]" and (2) "Newsday has reported its [12th, 13th, or 15th] consecutive increase in daily and its [10th, 13th, or

---

[12]   While it is undisputed that Newsday made misrepresentations to ABC about its circulation figures, that entity is not a party to this action.  The moving plaintiffs concede in their motion papers that "[t]he inflated figures[ were] not delivered to the [advertisers]" (Pls.' Mem. at 5), and "it is not the reports to ABC themselves upon which plaintiffs relied, but rather the Newsday correspondence" to the advertisers (*i.e.*, the Dear Advertiser Letters).  (Pls.' Reply at 3.) As such, the Court's analysis will be limited to only the purported misrepresentations in the Dear Advertiser Letters.

15th ] consecutive increase in Sunday circulation."[13]  (Giamo Decl., Ex. 2.)  As to the first

representation, there is evidence in the record which – if ultimately believed by the trier-of-fact –

indicates that this was an accurate representation, notwithstanding Newsday's embellished

circulation figures.  Newsday Vice President of Interactive and Classified Advertising, Michelle

Rothchild, declared that during the period mid-1995 through 2005, "*Newsday* had by far the

greatest daily and Sunday newspaper circulation on Long Island (even after correcting for the

overstatements of circulation in 2001-04)."  (Rothchild Decl. ¶ 6.)

Moreover, the record does not establish as a matter of law that the second representation

was false.  While the record contains evidence that Newsday overstated its circulation figures

during the Summary Judgment Period (*see, e.g.*, U.S. Attorney Agreement; July 2004 Letter), it

does not necessarily mean that Newsday's representation to advertisers that its reported circulation

figures were consecutively increasing was also false.[14]  The moving plaintiffs do not point to any

evidence which addresses what Newsday's circulation figures were with and without the

overstated figures at the time the Dear Advertiser Letters were drafted.  The moving plaintiffs

attempt to cure the evidentiary deficiency by pointing to Newsday's admission in the U.S.

Attorney Agreement that "[a] goal of the scheme was to mislead ABC to verify by audit

Newsday's claims that its paid circulation was increasing or at least not declining."  (U.S.

Attorney Agreement, Ex. A ¶ 3.)  While this admission is some evidence that Newsday's

circulation was not consecutively increasing, Newsday does not "specifically admit[] that the cited

_____

[13]  Once again, the bracketed numbers indicate the consecutive increases represented in each of the three Dear Advertiser Letters.

[14]  Had the Dear Advertiser Letters referred to specific circulation figures or the figures reported to ABC, the landscape of the present motion would be very different.

portion of the 'Dear Advertiser' letters was false" as the moving plaintiffs contend. (Pls.' Reply at 1-2.) The Court would still have to infer from the admission in the U.S. Attorney Agreement that Newsday's circulation figures would not have been consecutively increasing but for the inflated circulation figures reported to ABC, which inference, as the record now stands, is problematic. And, in any event, it is axiomatic that for summary judgment purposes, all inferences are to be drawn in favor of the nonmovant.

### C.     Reliance

The reliance element to a common law fraud claim is two pronged: "the plaintiff must have relied on the representation and such reliance must have been justifiable." *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989); *see also Fid. Funding of Cal., Inc. v. Reinhold*, 79 F. Supp. 2d 110, 120-121 (E.D.N.Y. 1997). Although it has already been determined that there are questions of fact as to whether the Dear Advertiser Letters contain material misrepresentations, even had the moving plaintiffs satisfied this element there are questions of fact concerning whether each of the moving plaintiffs actually relied on the letters.

First, the admissions by Newsday in the U.S. Attorney Agreement do not establish that the moving plaintiffs relied on the representations in the Dear Advertiser Letters.[15] In the U.S. Attorney Agreement, Newsday admitted that "[a] goal of the scheme was to . . . induce certain

---

[15] Nor does the September 26, 2006 affidavit from Scott Briggs, the United States Postal Inspector, establish reliance. In this affidavit, Briggs states that between January 2002 and June 2004, "advertisers relied on the paid circulation numbers reported by Newsday . . . to decide whether to advertise in those publications and to negotiate advertising rates." (Giamo Decl., Ex. 5 ("Briggs Aff.") ¶ 2.) Newsday correctly notes that Briggs fails to indicate in his affirmation that he has personal knowledge of this fact. Without such personal knowledge, this portion of his affidavit is insufficient to support a motion for summary judgment. *See* Fed. R. Civ. P. 56 (c)(4); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219.

advertisers to pay higher rates than accurate reports by Newsday to ABC would have justified."

(U.S. Attorney Agreement, Ex. A ¶ 3.)  The mere fact that it was Newsday's "goal" to induce

"certain" advertisers by such conduct does not constitute evidence that the goal was realized as to

any of the moving plaintiffs or, incidentally, as to any other individuals or entities similarly

situated.  It also warrants mention that the subject admission makes no reference to the Dear

Advertiser Letters, the documents containing the purported material misrepresentations cited by

the moving plaintiffs.

Second, there are material questions of fact as to whether the moving plaintiffs relied on

the Dear Advertiser Letters because they offer no evidence of their having received or reviewed

the letters.[16]   While the moving plaintiffs claim that "[i]t remains undisputed that Newsday sent

the cited 'Dear Advertiser' letters to all commercial advertisers" (Pls.' Reply at 3 n.4), the only

record evidence cited in support of this factual assertion are the Dear Advertiser Letters

themselves.  (*See* Pls.' 56.1 ¶ 6.)  The Dear Advertiser Letters, however, contain no indicia of

being sent to or received by the moving plaintiffs. Confusing whose burden it is to initially come

forward with evidence establishing that there are no genuine issues of material fact, the moving

plaintiffs claim that "Newsday asserts, without any authority, that it is undisputed that not all

advertisers received the cited letters."  (Pls.' Reply at 3 n.4.)  Even assuming Newsday's assertion

was unsupported, the moving plaintiffs gloss over their initial burden of having to come forward

---

[16]   The only evidence going to whether any of the moving plaintiffs received the Dear
Advertiser Letters comes from the deposition of Robert Santucci ("Santucci"), Douglaston's sole
owner and Rule 30(b)(6) witness.  Santucci testified that he could only recall receiving the
December 1, 2002 Dear Advertiser Letter. (*See* July 12, 2012 Hirth Decl. ("Hirth Decl."), Ex 1
("Santucci Dep.") at 44-47.)  This letter, however, was received by Douglaston after it had
already gone out of business.  (*Id.* at 20-21.)

with evidence establishing that they received the Dear Advertiser Letters which they have failed to do.

Third, even had the moving plaintiffs received the Dear Advertiser Letters, the record is devoid of evidence establishing actual reliance on those letters. While the moving plaintiffs argue that they relied on the Dear Advertiser Letters by placing advertisements in *Newsday*, they fail to identify any evidence that they placed one or more advertisements in *Newsday* during the Summary Judgment Period.[17] In fact, the record contains evidence to the contrary. Robert Potenza, the president and majority owner of College Point, testified that College Point ceased doing business sometime in 1997 or 1998 and, therefore, stopped advertising in *Newsday* at that point in time. (Hirth Decl., Ex. 2 ("Potenza Dep.") at 14-15, 19, 48.) Similarly, John Ganci, the president and owner of Parallel Productions, testified that Parallel Productions advertised in *Newsday* from September 1999 until December 2000, which is prior to the Summary Judgment Period. (Hirth Decl., Ex. 3 ("Ganci Dep.") at 14, 18-19.) Finally, Santucci testified that Douglaston advertised in *Newsday* from 1978 until it ceased doing business in January 2002, which does not encompass the entire Summary Judgment period for which liability is sought. (Santucci Dep. at 9, 20-21.)

---

[17] Instead of citing evidence that they advertised in *Newsday* during the Summary Judgment Period, the moving plaintiffs improperly rely on the allegations in the FAC. Even if this was appropriate for purposes of summary judgment, it is noteworthy that the FAC does not support this factual contention. (*See* FAC ¶ 27 (Douglaston Manor "advertised in Newsday from 1991 through 2000"); FAC ¶ 33 ("College Point . . . did advertise in Newsday from in or about November 23, 1992 to February 28, 1999."); FAC ¶ 68 ("Parallel Productions . . . did advertise in Newsday from in or about 1999 until in or about August 2000.").)

### D.      Conclusion

The moving plaintiffs have failed to establish an absence of any material issues of fact as to whether the Dear Advertiser Letters contained misrepresentations and, if so, whether they relied on those misrepresentations.  Accordingly, their motion for summary judgment is denied.

### III.      <u>Unjust Enrichment</u>

Under New York law, to make out a claim for unjust enrichment, a plaintiff must establish: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff."  *Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*, 273 F.3d 509, 519 (2d Cir. 2001); *accord Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009).  "'The theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation the law creates in the absence of any agreement.'" *Diesel Props. S.R.L. v. Greystone Bus. Credit II LLC.*, 631 F.3d 42, 54 (2d Cir. 2011) (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y. 3d 561, 572, 807 N.Y.S. 2d 583, 587, 841 N.E.2d 742, 746 (2005)).   It is well settled that "a claim alleging unjust enrichment may not be maintained where there is a valid and express agreement between the parties which explicitly covers the same specific subject matter for which the implied agreement is sought."  *MT Prop., Inc. v. Ira Weinstein & Larry Weinstein, LLC*, 50 A.D.3d 751, 752, 855 N.Y.S. 2d 627, 628 (2d Dep't 2008); *see also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987).  Thus, an unjust enrichment claim is precluded "whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact."  *Beth Israel Med. Cntr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d

Cir. 2006).

In the FAC, plaintiffs allege that by reason of Newsday's fraudulent acts and conduct, it has "wrongfully and fraudulently received more money for advertising . . . than [it] should have if [it] did not commit such fraud," and therefore, "have been unjustly enriched . . . by the difference between the money they paid for advertising space and . . . what they would have paid if the circulation volume . . . had not been fraudulently inflated." (FAC ¶¶ 356-57.) Seeking this claim's dismissal, Newsday contends that because each of the plaintiffs had a written advertising contract with Newsday that governed the advertising rates that it paid, plaintiffs are precluded from bringing unjust enrichment claims. Each plaintiff will be addressed in turn.

### A.     *Russo*

Russo placed advertisements in *Newsday* from approximately 1992 until July 2004. Beginning in 1992 and continuing for each year that he advertised in *Newsday*, Russo confirmed that he always had an advertising contract with Newsday. (July 16, 2012 Hirth Decl. ("Hirth Decl. II"), Ex. 6 ("Russo Dep.") at 18.) For instance, the record contains a copy of a Classified Contract, which was signed by Russo on September 22, 1993. (Hirth Decl. II, Ex. 7.) The Classified Contract incorporated as part of the contract Newsday's Classified Advertising Rate Card ("Classified Rate Card") which set forth the rates Russo was charged for placing advertisements in *Newsday*.[18] In addition, the Classified Contract provided that it "shall automatically renew for successive 12 month terms." (*Id.*) On August 18, 1998, Russo entered into a new Classified Contract with Newsday, which provided for automatic renewal for

---

[18] By signing the Classified Contract, Russo also acknowledged receipt of the applicable Classified Rate Card. (Hirth Decl. II, Ex. 7.)

successive 12 month terms.  (Hirth Decl. II, Ex. 8.)  This Classified Contract also incorporated as part of the contract the applicable Classified Rate Card that set forth the advertising rates to be charged.

Because all of the above factual assertions are undisputed (*see* Pls.' 56.1 Counterstmt ¶¶ 7-10), there are no material questions of fact preventing a determination on Newsday's summary judgment motion in connection with Russo.  The evidence establishes that during the relevant period of time, there was a valid and express agreement between Russo and Newsday which covered the amount Russo paid to advertise in *Newsday*.  As such, Russo is precluded from bringing an unjust enrichment claim here.  *See Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 388; *MT Prop., Inc.*, 50 A.D.3d at 752.

**B.    *College Point and Ron Bob Pub***

College Point and Ron Bob Pub placed advertisements in *Newsday* from the early 1990's until they ceased doing business, which was sometime in 1997 or 1998 and December 2001 respectively.  College Point entered into a Retail Advertising Contract ("RAC") with Newsday effective January 3, 1997, which applied to both College Point and Ron Bob Pub as the two companies advertised together under one contract.  (Hirth Decl. II, Ex. 13.)  The RAC incorporated as part of the contract the Newspapers' "Retail or Financial Advertising Rate Card" ("Rate Card") that set forth the rates that College Point and Ron Bob Pub were charged for placing advertisements in *Newsday*.  Pursuant to the RAC, College Point and Ron Bob Pub acknowledged receipt of the applicable Rate Card.  The RAC also provided that it "shall automatically renew for successive terms" and included the following terms and conditions:  "At the expiration of the initial term of this contract, this contract shall automatically renew for

successive terms . . . . Each renewal term shall begin on the first date Advertiser runs an advertisement after the expiration of the prior term." (*Id.*)

While the above facts are not disputed (*see* Pls.' 56.1 Counterstmt ¶¶ 11-17) and plaintiffs do not otherwise oppose Newsday's motion as it relates to College Point and Ron Bob Pub, the record does not establish Newsday's entitlement to judgment as a matter of law. Even if the RAC identified by Newsday automatically renewed for the duration of time that these plaintiffs advertised, the record lacks any testimony or documentation regarding a contract in existence prior to the 1997 RAC. Unlike Russo, who testified that he always had a written contract with Newsday, College Point and Ron Bob Pub did not make such a concession. In fact, these two plaintiffs testified through their shared president that they only had a written advertising contract with Newsday during "some" of the time they advertised in *Newsday*. (Hirth Decl. II, Ex. 10 ("Potenza Dep.") at 27.) Because the asserted claims, including unjust enrichment, cover purported fraudulent conduct affecting the advertising rates charged from mid-1995 through 2005, Newsday has not established that there was an enforceable contract (written or oral) during the entire period that this lawsuit covers. Therefore, based on the current record, College Point and Ron Bob Pub's unjust enrichment claim is not wholly precluded.

### C.    *Parallel Productions*

It is undisputed that Parallel Productions advertised in *Newsday* from September 1999 until December 2000. On September 23, 1999, Parallel Productions signed a RAC with Newsday, which took effect on September 17, 1999, the first day Parallel Productions placed an advertisement in *Newsday*. (Hirth Decl. II, Ex. 1 ("Ganci Dep.") at 27-28 & Ex. 3.) Pursuant to the RAC, "[a]ll terms and conditions printed on the reverse side hereof, and set forth in the

Newspaper's Retail or Financial Advertising Rate Card are incorporated herein and made a part of this agreement." (Hirth Decl. II, Ex. 3.) The Rate Card, which Parallel Productions acknowledged receipt of upon signing the RAC, set forth the rates for placing the particular "Restaurant" advertisements that Parallel Productions sought to place in *Newsday*. (Hirth Decl. II, Exs. 3-5; Ganci Dep. at 29-32.) The RAC stated that "[t]his agreement shall automatically renew for successive terms." (Hirth Decl. II, Ex. 3.)

In response to this evidence, plaintiffs claim that further discovery is needed based on the fact that: (1) the RAC is an incomplete document; (2) Newsday did not sign the RAC; and (3) the RAC does not state the term of the contract making it impossible to know what renewal for successive terms means. (Rosen Decl. ¶¶ 3-6.) The Court is not persuaded by any of these arguments. First, notwithstanding the lack of signature by Newsday, Parallel Productions confirmed that "there is no question . . . [it] had a contract in place" on September 17, 1999.[19] (Ganci Dep. at 27-28.) Second, while claiming that the RAC is incomplete, plaintiffs do not explain what is supposedly missing or come forward with any argument that the RAC is unreliable. Third, the unsupported allegation that the vagueness of the RAC warrants further discovery as to whether the RAC is valid ignores the testimony of Parallel Productions.[20] Parallel

---

[19] Parenthetically, the Court notes that the RAC begins by stating that "[b]y this agreement, the undersigned person, firm or corporation hereinafter referred to as the Advertiser, and Newsday, Inc., hereinafter referred to as the Newspaper, agree as follows." (Hirth Decl. II, Ex. 3.) Based on the language contained in the RAC, coupled with the fact that there is only a signature line for the Advertiser, it would appear that a signature from Newsday was unnecessary for the RAC to take effect.

[20] The contention, as presented, also does not satisfy the Federal Rules of Civil Procedure. Pursuant to Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to

Productions testified that the company always had an advertising contract in place with Newsday during the time it advertised.  (Ganci Dep. at 12.)  Between the RAC and Parallel Production's testimony, there is no genuine issue of material fact concerning whether Parallel Productions had a contract with Newsday in connection with advertising in *Newsday*, which only occurred for approximately fifteen months.  Because such a contract existed, Parallel Production's unjust enrichment claim must be dismissed.

### D.       Douglaston

Douglaston placed advertisements in *Newsday* from approximately 1978 until it ceased doing business in January 2002.  Douglaston entered into a RAC with Newsday effective August 21, 1996 ("August 1996 RAC"), which incorporated as part of the contract the Rate Card that set forth the rates that Douglaston was charged for placing advertisements in *Newsday*.  The RAC expressly referred to Restaurant Advertising "during the one year period from the effective date." (Hirth Decl. II, Ex. 16.)  The RAC also provided that it "shall automatically renew for successive terms."  (*Id.*)  Similar to plaintiffs College Point and Ron Bob Pub, even if the August 21, 1996 RAC automatically renewed up until Douglaston stopped advertising January 2002, the lack of evidence addressing whether a contract was in place in connection with Douglaston advertising prior to the August 1996 RAC is grounds for denying Newsday's motion for summary judgment seeking to dismiss Douglaston's unjust enrichment claim.

take discovery; or (3) issue any other appropriate order."  The affidavit must explain "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."  *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004); *accord Hoffman v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. 2012) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)).  The affidavit of Samuel Rosen falls woefully short of meeting these requirements.

## IV.    *Class Certification*

Plaintiffs seek to certify a class under Rule 23(a) and (b)(3) consisting of commercial

advertisers who placed advertisements in *Newsday* during the period mid-1995 through 2005

("Class Period"), excluding those advertisers who previously settled.[21]  (Pls.' Cert. Mem. at 7-8.)

According to Newsday, between January 1, 1996 and December 31, 2005, there were

approximately 140,390 commercial advertisers in *Newsday* who have not settled.[22]  (DeMarco

Decl. ¶ 4.)

Class action certification is governed by Federal Rule of Civil Procedure 23.  In seeking

class certification, a plaintiff must first demonstrate that the prerequisites contained in Rule 23(a)

have been satisfied.  Fed. R. Civ. P. 23(a)(1)-(4); *see also Teamsters Local 445 Freight Div.*

*Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008) ("In determining whether

class certification is appropriate, a district court must first ascertain whether the claims meet the

preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy.")  Second, a

plaintiff must show that the putative class falls within one of the categories set forth in Rule 23(b).

Fed. R. Civ. P. 23(b)(1)-(3); *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) ("Not only must

each of the requirements set forth in Rule 23(a) be met, but certification of the class must also be

deemed appropriate under one of the three subdivisions of Rule 23(b).").

---

[21]  While plaintiffs initially identified the proposed class as all advertisers in Newsday, Hoy, and DSA, plaintiffs confirm that since Hoy and DSA are part of a bankruptcy proceeding, they "are not seeking at this time to certify a class against Hoy and DSA."  (Pls.' Cert. Mem. at 2 n.6.).  Moreover, subsequent to filing their motion, plaintiffs clarified that they are only seeking to certify a class consisting of commercial advertisers.  (*See* April 5, 2012 Hirth Decl. ("Hirth Decl. III") ¶ 2 & Ex. 1.)

[22]  Newsday states that as of April 5, 2012, 32,443 commercial advertisers in *Newsday* have settled.  (DeMarco Decl. ¶ 5.)

The Second Circuit has emphasized that "the certification decision requires 'rigorous analysis'" on the part of the district court. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006); *see also id.* at 33 n.3 (finding that the "rigorous analysis" "applies with equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3)"). In this regard, the Second Circuit has set forth the following standard:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Id.* at 41. "The Rule 23 requirements must be established by at least a preponderance of the evidence." *Brown*, 609 F.3d at 476.

Newsday does not dispute that plaintiffs can satisfy the prerequisites enumerated in Rule 23(a). (Def.'s Cert. Opp'n at 12.) While conceding that there are "questions of law or fact common to the class as required by Rule 23(a)(2) – such as whether Newsday engaged in a fraudulent scheme to inflate the circulation volume of *Newsday* and whether it misrepresented *Newsday's* paid circulation to ABC," Newsday contends that plaintiffs cannot satisfy Rule 23(b)(3)'s requirement that class-wide issues predominate over individual issues. (*Id.*) The sole

issue then is whether the requirement that common questions predominate over individual questions has been met.

### A.    *Rule 23(b)(3)*

Rule 23(b)(3) provides that a class action may be maintained if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[23]  Fed. R. Civ. P. 23(b)(3).  "The predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof."  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107-08 (2d Cir. 2007); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (stating that Rule 23(b)(3) is satisfied when plaintiffs show "that more 'substantial' aspects of this litigation will be susceptible to generalized proof for all class members than any individualized issues").  In making this determination, a court's focus is on liability, not damages. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *accord Morangelli v. Chemed Corp.* 275 F.R.D. 99, 105 (E.D.N.Y. 2011).

---

[23]  Because the Court concludes that common questions do not predominate, it need not address whether a class action is a superior method of adjudicating plaintiffs' claims.

Plaintiffs argue that their claims "are all susceptible to class adjudication because they are all based upon the common question of defendants' fraudulent scheme and assert legal theories that can be proven through generalized proof." (Pls.' Cert. Mem. at 20.) In response, Newsday claims that "plaintiffs cannot show that the legal or factual issues susceptible to generalized proof for all class members are more substantial than the issues subject only to individualized proof." (Def.'s Cert. Opp'n at 3.) As will be shown below, maintenance of this suit as a class action is inappropriate given that the resolution of the claims asserted here require a plaintiff-by-plaintiff determination.[24]

### 1.    Fraud

As an initial matter, plaintiffs – similar to the moving plaintiffs' summary judgment motion – claim that Newsday admitted to fraudulent conduct and, in so doing, admitted to each and every element of common law fraud. Thus, plaintiffs claim that Newsday has admitted to class-wide liability on this claim, eliminating the need for any individualized proof on liability as to each advertiser, leaving only the issue of damages. For the same reasons previously explained, however, the concessions made by Newsday in the U.S. Attorney Agreement do not legally or factually constitutes an admission of having committed common law fraud, either with respect to the moving plaintiffs or any other advertiser who placed commercial advertisements during the Class Period.[25]

---

[24] Although plaintiffs also have a claim against defendant Langer for RICO violations, they neglect to make any argument, factual showing, or even reference to their RICO claims. As such, plaintiffs have failed to meet their burden in establishing that common questions would predominate over individual ones in connection with this claim.

[25] Even had the admissions contained in the U.S. Attorney Agreement provided for class-wide liability, it would only cover a portion of the ten-year Class Period, namely 2001 through

In addition, the Court finds that individual issues predominate with respect to establishing liability on plaintiffs' common law fraud claim. First, the fact that the claims of the purported class all arise out of Newsday's fraudulent scheme of inflating their circulation figures is of limited significance for purposes of determining whether common issues predominate since "liability for fraudulent misrepresentations cannot be established simply by proof of a central coordinated scheme." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). As the Second Circuit explained:

> [A] common course of conduct is not enough to show predominance, because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff. In order to establish [defendant's] liability, each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss. But a common course of conduct does not demonstrate that any specific statements made pursuant to that scheme were actionable.

*Id.* at 1255 (internal citations omitted).

Second, generalized proof would not be sufficient for plaintiffs' fraud claim because the misrepresentations were not uniform. In addressing when certifying a class is permissible in a fraud-based case, the Second Circuit explained:

> Fraud actions must therefore be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof. Where there are material variations in the nature of the misrepresentations made to each member of the proposed class, however, class certification is improper because plaintiffs will need to

---

May 2004. Plaintiffs fail to provide any explanation, no less authority, as to why these admissions support certifying a class for the entire Class Period.

> submit proof of the statements made to each plaintiff, the nature of the
> varying material misrepresentations, and the reliance of each plaintiff
> upon those misrepresentations in order to sustain their claims.

*Id.* at 1253.

The misrepresentations alleged in the FAC include circulation figures reported to ABC and "oral and written representations . . . as to the circulation volume of Newsday" to plaintiffs. (*See* FAC ¶¶ 22, 34, 42, 68, 77.)  Plaintiffs, however, concede that their theory of liability is not predicated on the misrepresentations made to ABC, but rather, the misrepresentations made directly to the advertisers.  (*See* Pls.' Cert. Reply at 6.)  Plaintiffs further acknowledge that the purported oral misrepresentations are not a basis for class certification.  (*See* Pls.' Reply at 9-10).  Focusing, therefore, on the purported written misrepresentations to the advertisers, plaintiffs rely on the annual one-page letters sent by Newsday to commercial advertisers during the Class Period (collectively, "Annual Letters") as evidence of uniform class-wide misrepresentations.[26]  (*See* Pls.' Reply at 9-10; Giaimo Supp. Decl., Ex. 1.)

Despite plaintiffs' insistence that the Annual Letters are uniform, a review of the letters show that they contain material differences.  For example, the 1995 letter makes no reference whatsoever to circulation; the 1996 and 1997 letters mention that there were "circulation gains, both daily and Sunday;" the 1998 and 1999 letters represent specific circulation increases; and the 2000 through 2003 letters state that there were consecutive increases in daily and Sunday circulation.  (Giaimo Supp. Decl., Ex. 1.)  While those advertisers who received the 1995 letter would be hard pressed to show that there was a circulation misrepresentation in that letter, those

---

[26]  As for the other "marketing materials" referenced by plaintiffs, such materials either do not reference circulation or are documents that contain *Newsday* circulation figures which pre-date the alleged fraud and Class Period.  (*See* Giaimo Supp. Dec., Exs. 2-6.)

advertisers who received the 1998 and 1999 letters can point to a specific number that Newsday represented as the circulation increase from the prior year. Because advertisers in the purported class received letters of varying content (*i.e.*, no mention of circulation, reference to a circulation gains, or a specific circulation increase), it cannot be said that the misrepresentations are uniform. Without such uniformity, class certification would be improper.

Third, reliance in this case is too individualized to be the subject of generalized proof. While plaintiffs claim that class-wide reliance can be established here, they fail to articulate how, other than to argue that "[b]ecause the misrepresentations were uniform to all class members, reliance also predominates class-wide." (Pls.' Reply at 10.) Even if plaintiffs could have proven the misrepresentation element through generalized proof, "proof of misrepresentation-even widespread and uniform misrepresentation-only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008); *see also Moore*, 306 F.3d at 1253 ("On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation . . . in the kinds or degrees of reliance by the persons to whom they were addressed.") (quoting Fed. R. Civ. P. 23(b)(3) Advisory Committee Notes); *Blessing v. Sirius XM Radio Inc.*, 2011 WL 1194707, at *10 (S.D.N.Y. Mar. 29, 2011) ("Courts have often held that reliance on a misrepresentation requires individualized proof.").

While the Second Circuit declined to adopt the Fifth Circuit's blanket rule as articulated in *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) that certification is not appropriate in a fraud class action where individual reliance is an issue, *McLaughlin*, 522 F.3d at 225, it noted the difficulty in proving reliance through class-wide proof, *id.* at 225 n.6. In *McLaughlin*, a group of

smokers allegedly deceived by the defendants' marketing and branding that "light" cigarettes were healthier than "full-flavored" cigarettes sought to certify a class action. *Id.* at 220. Rejecting the notion that plaintiffs could prove reliance based on the national marketing campaign of the defendants, the Second Circuit concluded that "[i]ndividualized proof is needed to overcome the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative-for example, if a Lights smoker was unaware of that representation, preferred the taste of Lights, or chose Lights as an expression of personal style."[27] *Id.* at 223.

Similar to *McLaughlin*, each plaintiff in this case could have chosen to advertise in *Newsday* for any number of reasons besides circulation volume. The advertisers may not have received or reviewed the Annual Letters or chose to advertise in *Newsday* based on non-circulation reasons including, but not limited to, demographic and geographic reasons. By way of one example, despite the fact that Douglaston advertised in *Newsday* over the course of many years, it could only recall receiving one Annual Letter. (*See* Santucci Dep. at 44-47.) In addition, since Douglaston's clientele came from Queens and Nassau, it acknowledged that one of the reasons for advertising in *Newsday* was that the paper covered both counties. (*Id.* at 22-24, 35.) Nothing in plaintiffs' submissions indicate that Douglaston is an outlier or that reliance will not vary from one advertiser to another. Thus, individualized proof is necessary to show that each

---

[27] Subsequent to the *McLaughlin* case, which was an action brought under civil RICO, the Supreme Court concluded that reliance was not a necessary element to a civil RICO claim. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008). While no longer a necessary element to civil RICO claims, reliance remains a necessary element to common law fraud. Therefore, the reasoning in *McLaughlin* is instructive for present puropses.

advertiser relied on a material misrepresentation by Newsday.[28]

Because plaintiffs seek to certify a class in a fraud-based action in which neither the purported misrepresentation nor the advertiser's reliance is amenable to generalized proof, common questions do not predominate over questions affecting only individual advertisers regarding plaintiffs' common law fraud claim.

## 2.    Unjust Enrichment

To make out a claim for unjust enrichment, a plaintiff must demonstrate that the defendant benefitted at the plaintiff's expense and "that equity and good conscience require restitution." *Leibowitz*, 584 F.3d at 509.  In arguing that common issues predominate individualized issues regarding their unjust enrichment claim, plaintiffs maintain that "the issues of misrepresentations and reliance are common to plaintiffs unjust enrichment claim just as they are to plaintiffs' common law fraud claims."  (Pls.' Reply at 14.)  But, for the same reasons articulated for the common law fraud claim, plaintiffs have not shown that they will be able to prove these issues on a class-wide basis.  Thus, issues surrounding whether Newsday benefitted at the expense of

---

28    Although plaintiffs also argue that New York State courts have certified classes under common law fraud by presuming reliance when there are uniform misrepresentations, this Court has already determined that the misrepresentations at issue in this case are not uniform. Moreover, courts in this Circuit have only recognized a presumption of reliance, commonly referred to as the fraud-on-the-market theory, in cases alleging federal securities law and not common law fraud.  *See, e.g.*, *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000) ("New York has not adopted even the well-recognized fraud on the market theory to allow a presumption of reliance in common-law fraud cases"); *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 598 (S.D.N.Y. 2008) ("[C]ourts in this Circuit have consistently held that while the 'fraud on the market' theory and the rebuttable presumption of reliance is available to plaintiffs alleging claims under the federal securities laws, it is still not available to those alleging common law fraud.")  Even if such a presumption was recognized, it is noteworthy that the facts of this case show that reliance could not be presumed as there are a number of reasons why advertisers placed advertisements in *Newsday* beyond circulation figures.

commercial advertisers will be based on the circumstances of each commercial advertiser, including whether references to *Newsday's* circulation volume in the Annual Letters were a factor in each advertiser's decision to advertise in *Newsday*. *See Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010) (finding individual issues "dwarf any issues of law or fact common to the class" based on plaintiffs' failure to show "how they would prove, on a class-wide basis, whether the benefits that putative class members received were less than what they bargained for") (internal quotation marks omitted); *Dungan v. Acad. at Ivy Ridge*, 249 F.R.D. 413, 427 (N.D.N.Y. 2008) ("Plaintiffs' claims of unjust enrichment will require individualized proof as to each plaintiff's situation and an individualized analysis of 'equity' and 'good conscience.'")

Further supporting the conclusion that individualized issues predominate is the fact that, as a threshold issue, each commercial advertiser will have to show that it did not have a written or oral contract with Newsday governing the rates paid for placing advertisements. The existence of such a contract bars an unjust enrichment claim.[29] Such proof will be individual to each advertiser. Accordingly, plaintiffs have failed to meet their burden of showing common questions predominate in connection with their unjust enrichment claim.

## CONCLUSION

For the reasons set forth above, the moving plaintiffs' motion for partial summary judgment and class certification are DENIED. Newsday's cross-motion for partial summary judgment seeking to dismiss plaintiffs' unjust enrichment claim is GRANTED as to Parallel

---

[29] As discussed *supra*, all of the moving plaintiffs had a contract with Newsday, some of which barred their respective unjust enrichment claims as the contract covered the entire period at issue.

Productions and Russo and DENIED as to College Point, Ron Bob Pub, and Douglaston.  This

action is referred to Magistrate Judge Wall for all remaining pretrial supervision

**SO ORDERED.**

Dated: Central Islip, New York
  March 29, 2013

_____/s/_____
Denis R. Hurley
Unites States District Judge